No. 85,898

STATE OF KANSAS, *Appellee,* v. MATTHEW R. LIMON, *Appellant.*

(122 P.3d 22)

Opinion filed October 21, 2005.

*James D. Esseks,* of American Civil Liberties Union Foundation, Lesbian & Gay Rights Project, of New York, New York, argued the cause, and *Tamara Lange,* of American Civil Liberties Union Foundation, Lesbian & Gay Rights Project, of San Francisco, California, and *Paige A. Nichols,* of Lawrence, were with him on the briefs for appellant.

*Jared S. Maag,* deputy attorney general, argued the cause, and *Phill Kline,* attorney general, was with him on the briefs for appellee.

*Jeffrey E. Goering,* of Thompson, Stout & Goering, LLC, of Wichita, and *Matthew D. Staver,* of Liberty Counsel, of Longwood, Florida, were on the brief for *amicus curiae* Kansas Legislators.

*Timothy M. O'Brien* and *Chelsi K. Hayden,* of Shook, Hardy & Bacon, L.L.P., of Overland Park, and *Julie M. Carpenter* and *Nicole G. Berner,* of Jenner & Block, LLC of Washington, D.C., were on the brief for *amicus curiae* DKT Liberty Project.

*Eric D. Barton,* of Wagstaff & Cartmell, LLP, of Kansas City, Missouri, and *Hayley Gorenberg,* of Lambda Legal, of New York, New York, were on the brief for *amici curiae* Kansas Public Health Association, American Public Health Association, American Academy of HIV Medicine, American Foundation for AIDS Research, HIV Medicine Association, International Association of Physicians in AIDS Care, National Alliance of State and Territorial AIDS Directors, and National Minority AIDS Council.

*Melanie S. Morgan,* of Kansas City, and *Ruth N. Borenstein, Leecia Welch,* and *Sylvia M. Sokol,* of Morrison & Foerster, LLP, of San Francisco, California, were

on the brief for *amici curiae* National Association of Social Workers and Kansas Chapter of the National Association of Social Workers.

The opinion was delivered by

LUCKERT, J.: The principal issue presented in this case is whether the Kansas unlawful voluntary sexual relations statute, K.S.A. 2004 Supp. 21-3522, violates the equal protection provision of the Fourteenth Amendment to the United States Constitution. Matthew Limon argues that the United States Supreme Court decision in *Lawrence v. Texas*, 539 U.S. 558, 156 L. Ed. 2d 508, 123 S. Ct. 2472 (2003), requires this court to find the statute unconstitutional because it results in a punishment for unlawful voluntary sexual conduct between members of the opposite sex that is less harsh than the punishment for the same conduct between members of the same sex.

The statute subject to this challenge, commonly referred to as the Romeo and Juliet statute, applies to voluntary sexual intercourse, sodomy, or lewd touching when, at the time of the incident, (1) the victim is a child of 14 or 15; (2) the offender is less than 19 years of age and less than 4 years older than the victim; (3) the victim and offender are the only ones involved; and (4) the victim and offender are members of the opposite sex. K.S.A. 2004 Supp. 21-3522. Limon's conduct meets all of the elements of the Romeo and Juliet statute except the one limiting application to acts between members of the opposite sex.

When the Romeo and Juliet statute applies, prison terms are shorter and other consequences, such as postrelease supervision periods and sex offender registration requirements, are less harsh than when general rape, sodomy, and lewd touching statutes apply. Because these disparities are based upon the homosexual nature of Limon's conduct, he argues the Romeo and Juliet statute creates a classification which violates the equal protection principles announced by the United States Supreme Court. Limon suggests we apply a strict level of scrutiny when reviewing his claim, but asserts that even if the rational basis test applies, under the guidance of *Lawrence*, the classification bears no rational relationship to legitimate State interests.

We agree that the United States Supreme Court's decision in *Lawrence* controls our analysis and, when considered in conjunction with several equal protection decisions of the United States Supreme Court, requires us to hold that the State does not have a rational basis for the statutory classification created in the Romeo and Juliet statute.

Because we reach this conclusion, we will not reach Limon's other constitutional attacks upon his conviction. However, we will discuss his argument that his sentence violates the principles enunciated by the United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

### Factual and Procedural Background

Limon was convicted of criminal sodomy pursuant to K.S.A. 21-3505(a)(2) after a bench trial on stipulated facts. The stipulation established that on February 16, 2000, Limon had consensual oral contact with the genitalia of M.A.R. Both Limon and M.A.R. are male. Limon turned 18 years of age just 1 week before the incident; his date of birth is February 9, 1982. He was less than 4 years older than M.A.R., who turned 15 years of age the month following the incident. M.A.R.'s date of birth is March 17, 1985.

After his conviction, Limon filed a motion for a downward durational departure from the presumptive sentence under the Kansas sentencing guidelines. He also renewed his argument that his equal protection rights had been violated by the conviction. These motions were argued and evidence was presented at the sentencing hearing.

The contact occurred at a school for developmentally disabled children where Limon and M.A.R. were residents. Although there is a discrepancy between Limon's and M.A.R.'s functioning, the difference is minor. Intellectually, Limon falls between the ranges described as borderline intellectual functioning and mild mental retardation. M.A.R. functions in the upper limits of the range of mild mental retardation. M.A.R. consented to the sexual contact, and when he asked Limon to stop, Limon did so.

The trial court rejected Limon's equal protection argument and denied the motion for downward durational departure. The trial

court found that Limon's criminal history category was B because of two prior juvenile adjudications for aggravated criminal sodomy. Limon was sentenced to 206 months' imprisonment, which was the mitigated term under the Kansas sentencing guidelines for a severity level 3 crime where the defendant has a criminal history falling in category B. As a consequence of Limon's conviction, he is subject to 60 months' of postrelease supervision and is required to register as a persistent sexual offender. K.S.A. 22-4902 *et seq.* By contrast, had Limon been convicted of sodomy under the unlawful sexual relations statute, the presumptive sentence at the time of the offense (and now) would have been only 13, 14, or 15 months' imprisonment. K.S.A. 1999 Supp. 21-4704. Moreover, those sentenced under the unlawful sexual relations statute are not subject to the provisions regarding sentencing of persistent sexual offenders (K.S.A. 2004 Supp. 21-4704[j] and K.S.A. 2004 Supp. 22-3717[d][2]) or required to register as a sex offender (K.S.A. 22-4902).

Limon appealed, and the Court of Appeals affirmed his conviction and sentence in *State v. Limon,* No. 85,898, unpublished opinion filed February 1, 2002, *rev. denied* 274 Kan. 1116 (2002) (*Limon I*). The Court of Appeals' decision was based primarily upon *Bowers v. Hardwick,* 478 U.S. 186, 92 L. Ed. 2d 140, 106 S. Ct. 2841 (1986), *overruled by Lawrence v. Texas,* 539 U.S. 558, 156 L. Ed. 2d 508, 123 S. Ct. 2472 (2003).

Limon sought this court's review of the Court of Appeals' decision; his petition was denied. Limon then filed a petition for writ of certiorari to the United States Supreme Court. While his petition was pending, the Supreme Court issued its decision in *Lawrence v. Texas,* which involved two adult men who engaged in private, consensual anal sex; they were charged and convicted under a Texas statute which prohibited "deviate sexual intercourse" between persons of the same sex.

In an opinion authored by Justice Kennedy and joined by Justices Stevens, Souter, Ginsburg, and Breyer, the Court held that the Texas statute violated the Due Process Clause. In doing so, the Court focused upon *Bowers,* the decision upon which the Kansas Court of Appeals had relied in the instant case. In *Bowers,* the

United States Supreme Court sustained a Georgia criminal sodomy statute against a claim the provision violated the Due Process Clause. In a turnabout of the holding in *Bowers*, the *Lawrence* Court concluded: *"Bowers* was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. *Bowers v. Hardwick* should be and now is overruled." 539 U.S. at 578.

The *Lawrence* Court recognized a liberty interest and considered whether the State's infringement of that interest was justified by a legitimate State interest:

"The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. 'It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter.' [Citation omitted.] The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." 539 U.S. at 578.

Justice O'Connor concurred, finding the Texas statute unconstitutional. However, she did not join in the majority's analysis that the statute violated the Due Process Clause. She would have found the statute unconstitutional as a violation of equal protection. She concluded her analysis by stating: "A law branding one class of persons as criminal based solely on the State's moral disapproval of that class and the conduct associated with that class runs contrary to the values of the Constitution and the Equal Protection Clause, under any standard of review." 539 U.S. at 585 (O'Connor, concurring).

Justice Scalia wrote a dissenting opinion which Chief Justice Rehnquist and Justice Thomas joined. For our purposes, the dissent is instructive because of its discussion of what the majority opinion does or does not do. Especially significant to our review is Justice Scalia's conclusion that the majority opinion means that "the promotion of majoritarian sexual morality is not even a *legitimate* state interest" and that criminal legislation on matters such as "fornication, bigamy, adultery, adult incest, bestiality, and ob-

scenity" cannot "survive rational-basis review." 539 U.S. at 599 (Scalia, J., dissenting).

One day after issuing this decision, the Supreme Court granted Limon's petition, vacated the judgment, and remanded the case to the Kansas Court of Appeals "for further consideration in light of *Lawrence v. Texas*." *Limon v. Kansas*, 539 U.S. 955, 156 L. Ed. 2d 652, 123 S. Ct. 2638 (2003).

The decision upon remand was fractured; each judge on the three judge panel of the Court of Appeals filed a separate opinion. Although stating a different rationale, two judges agreed that Limon's conviction and sentence should once again be affirmed. The Court of Appeals majority opinion, authored by Judge Green, dismissed the application of *Lawrence,* concluding it "is factually and legally distinguishable from the present case." *State v. Limon*, 32 Kan. App. 2d 369, 373, 83 P.3d 229 (2004). The Court of Appeals majority focused upon Justice Kennedy's explanation that "[t]he present case does not involve minors." 32 Kan. App. 2d at 373-74 (quoting *Lawrence,* 539 U.S. at 578). Rather, *Lawrence* involved "two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle." 539 U.S. at 578. Additionally, the Court of Appeals majority distinguished the legal analysis, noting that the *Lawrence* majority declined to apply an equal protection analysis and instead determined the Texas statute violated the Due Process Clause. In contrast, Limon does not assert a due process challenge.

Judge Green applied the lowest level of scrutiny, the rational basis test, when analyzing Limon's equal protection claim and found that the legislature "could have rationally determined that heterosexual sodomy between a child and an adult could be put in a class by itself and could be dealt with differently than homosexual sodomy between a child and an adult." 32 Kan. App. 2d at 375. Judge Green identified four interests which he believed provided a rational basis for the classification:

(1) Protection of Children. "[T]he legislature could well have concluded that homosexual sodomy between children and young adults could disturb the traditional sexual development of children. . . . K.S.A. [2004 Supp.] 21-3522 is designed to discourage

voluntary sexual behavior between young adults and children which deviates from traditional sexual mores." 32 Kan. App. 2d at 377. The classification which gives a more lenient sentence to members of the opposite sex is proper "because it is rationally related to the purpose of protecting and preserving the traditional sexual mores of society and the historical sexual development of children." 32 Kan. App. 2d at 377.

(2) Marriage and Procreation. Judge Green concluded the government has a legitimate interest in protecting marriage and procreation because the survival of society requires replenishment of its members. Since sexual acts between same-sex couples do not lead to procreation, he reasoned that the classification contained in K.S.A. 2004 Supp. 21-3522 advances the government's interest in protecting and advancing the family as the commonly recognized unit for procreation. 32 Kan. App. 2d at 378.

(3) Parental Responsibility. Judge Green also observed that the legislature might have determined that lengthy incarceration of a young adult offender who has become a parent as a result of a heterosexual relationship with a minor would be counterproductive to that young adult's duty to support his or her child. Because same-sex relationships do not generally lead to unplanned pregnancies, the need to release a same-sex offender from incarceration is absent. Thus, Judge Green concluded, K.S.A. 2004 Supp. 21-3522 advances the government's interest in getting a young adult parent involved in providing financial support for the child. 32 Kan. App. 2d at 378-79.

(4) Prevention of Sexually Transmitted Disease. Finally, Judge Green concluded that the legislature could have considered the fact "that certain health risks are more generally associated with homosexual activity than with heterosexual activity," thus K.S.A. 2004 Supp. 21-3522 is rationally related to the government's legitimate interest in protecting public health. 32 Kan. App. 2d at 379.

Judge Green also rejected Limon's claims that K.S.A. 2004 Supp. 21-3522 impermissibly discriminates on the basis of gender and that his conviction and sentence violated the Eighth Amendment prohibition against cruel and unusual punishment because his sen-

tence was disproportionate to the crime of criminal sodomy. 32 Kan. App. 2d at 380-81.

In his concurring opinion, Judge Malone agreed that K.S.A. 2004 Supp. 21-3522 does not discriminate on the basis of gender. He also agreed that *Lawrence* was both factually and legally distinguishable because it involved adults and was decided on due process rather than equal protection grounds. 32 Kan. App. 2d at 386. Judge Malone agreed with Judge Green's analysis that the Romeo and Juliet law should be evaluated under the rational basis test and stated:

> "I cannot embrace every rational basis suggested in the majority opinion for upholding the constitutionality of K.S.A. [2004] Supp. 21-3522, and in fact I disagree with many of the positions advanced in the majority opinion. However, if the only rational basis justifying the statute is the legislature's intention to protect children from increased health risks associated with homosexual activity until they are old enough to be more certain of their choice, it is within the legislature's prerogative to make that determination. This rationale, although tenuous in some respects, provides a 'reasonably conceivable state of facts' sufficient to justify the statutory classification." 32 Kan. App. 2d at 388.

Judge Pierron dissented. Although he, too, applied the rational basis test in determining whether K.S.A. 2004 Supp. 21-3522 was constitutional, he emphasized that "[l]egislative disapproval of homosexuality alone is not enough to justify any measures the legislature might choose to express its disapproval. Under the rational basis test, there must be a showing that the measures adopted have a rational relationship to a legitimate legislative concern." 32 Kan. App. 2d at 396. Reviewing each of the reasons offered by the State to justify the discriminatory sentencing provision, Judge Pierron determined that none of them bore any rational relationship to the statute's classification. 32 Kan. App. 2d at 396-400. He concluded: "The purpose of the law is not to accomplish any of the stated aims other than to punish homosexuals more severely than heterosexuals for doing the same admittedly criminal acts." 32 Kan. App. 2d at 400. Judge Pierron would hold that the classification violates the Due Process Clause of the Fifth and Fourteenth Amendments and would strike the unconstitutional classification from the statute. 32 Kan. App. 2d at 400.

Limon filed a petition for review which this court granted.

*Analysis*

In this appeal, Limon primarily argues that to punish criminal voluntary sexual conduct between teenagers of the same sex more harshly than criminal voluntary sexual conduct between teenagers of the opposite sex is a violation of the equal protection provision of the United States Constitution.

"Whether a statute violates equal protection is a question of law over which this court has unlimited review." *State v. Mueller*, 271 Kan. 897, 902, 27 P.3d 884 (2001).

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution demands that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." The guiding principle of the Equal Protection Clause is that similarly situated individuals should be treated alike. *Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985); *Chiles v. State*, 254 Kan. 888, 895, 869 P.2d 707, *cert. denied* 513 U.S. 850 (1994).

Limon's arguments are constructed entirely upon the precedent of United States Supreme Court cases, and those precedents command our decision in this case. However, Limon also cites § 1 of the Kansas Constitution Bill of Rights and, thus, preserves a state constitutional claim.

Sections 1 and 2 of the Kansas Constitution Bill of Rights "are given much the same effect as the clauses of the Fourteenth Amendment relating to due process and equal protection of the law." *Farley v. Engelken*, 241 Kan. 663, 667, 740 P.2d 1058 (1987). Section 1 applies in cases such as this one when an equal protection challenge involves individual rights. 241 Kan. at 667.

Traditionally, when analyzing an equal protection claim, the United States and Kansas Supreme Courts employ three levels of scrutiny: strict scrutiny, intermediate scrutiny, and the rational basis test. *Chiles*, 254 Kan. at 891-92. The level of scrutiny applied by the court depends on the nature of the legislative classification and the rights affected by that classification. *Romer v. Evans*, 517 U.S. 620, 632, 134 L. Ed. 2d 855, 116 S. Ct. 1620 (1996). The

general rule is that a law will be subject to the rational basis test unless the legislative classification targets a suspect class or burdens a fundamental right. 517 U.S. at 631. In *Farley*, this court stated:

"When a statute is attacked on equal protection grounds, the general rule is that the statute is presumed constitutional, and the burden is on the party attacking the statute to prove otherwise. Only in cases involving 'suspect classifications' or 'fundamental interests' is the presumption of constitutionality displaced and the burden placed on the party asserting constitutionality to demonstrate a compelling state interest which justifies the classification." 241 Kan. at 667.

Thus, when an equal protection claim is made, the first step of the analysis is to determine the nature of the legislative classification and the rights which are affected by the classification. That determination will dictate the level of scrutiny which applies. The final step of the analysis requires determining whether the classification withstands the scrutiny.

## *Classification*

In the first step, we must examine the nature of the classification created by the Romeo and Juliet statute. The State argues that the statute applies only to conduct and does not discriminate against any class of individual, in particular against homosexual persons. The State also argues that nothing in the record establishes that either Limon or M.A.R. is homosexual.

Indeed, there is no per se classification of homosexuals, bisexuals, or heterosexuals in the statute, nor do we know which classification applies to Limon or M.A.R. However, that does not mean that Limon's argument fails. As Justice Scalia noted in his dissent in *Romer*, "there can hardly be more palpable discrimination against a class than making the *conduct* that defines the class criminal." (Emphasis added.) 517 U.S. at 641. The majority in *Lawrence* similarly noted that making homosexual conduct criminal and not legislating against "deviate sexual intercourse" committed by persons of different sexes "in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres." 539 U.S. at 575. Throughout the *Lawrence* opinion, the majority refers to the stigmatizing and demeaning effect of criminalizing conduct commonly engaged in by

homosexuals and concludes that a state may not "demean their existence or control their destiny." 539 U.S. at 578. Additionally, *Lawrence* makes it clear that *Romer* applies to "persons who were homosexuals, lesbians, or bisexual either by 'orientation, conduct, practices or relationships.' " *Lawrence*, 539 U.S. at 574 (quoting *Romer*, 517 U.S. at 624).

This case is different from *Lawrence*, where homosexual conduct was criminal and heterosexual conduct was not. The *Lawrence* Court focused upon the "stigma" the criminal statute imposed which it characterized as "not trivial." 539 U.S. at 575. Here, both types of conduct are criminalized and, thus, stigma attaches to the heterosexual conduct covered by the Romeo and Juliet statute. However, there is an enormous escalation in the severity of punishment for those punished under the general rape, sodomy, and lewd act statutes. The Kansas Sentencing Guidelines impose a presumptive sentence of prison upon all defendants, including those with no prior criminal history, who are convicted of a severity level 3 felony, the severity level applying to Limon's conviction. In contrast, a presumption of probation applies to all sentences, except those for defendants with criminal histories of "A" or "B," who are sentenced for a severity level 9 crime, which would be the applicable severity level for sodomy if the Romeo and Juliet statute applied.

Additionally, the presumptive terms of imprisonment for a severity level 3 felony, as noted earlier, are approximately 15 times that of a severity level 9 felony. As also discussed earlier, for Limon, whose criminal history score was a B, this classification means the difference between a 13-, 14-, or 15-month prison sentence and a 206-month prison sentence. K.S.A. 2004 Supp. 21-4704. For a defendant with no criminal history, a conviction of criminal sodomy (as charged in this case) entails a sentencing range of 55-59-61 months' presumptive imprisonment while a conviction of unlawful voluntary sexual relations under the Romeo and Juliet statute entails a sentencing range of 5-6-7 months with the presumption of *probation*. K.S.A. 2004 Supp. 21-4704. This represents an extreme disparity in sentencing.

There is also the distinction that Limon faces the stigma of sex offender registration; those convicted under the Romeo and Juliet statute do not. K.S.A. 22-4902.

Furthermore, the demeaning and stigmatizing effect upon which the *Lawrence* Court focused is at least equally applicable to teenagers, both the victim and the offender, as it is to adults and, according to some, the impact is greater upon a teen.

Based upon these considerations we conclude there is a discriminatory classification requiring us to examine the level of scrutiny to be applied in testing the constitutionality of the classification.

## Level of Scrutiny

The next step of our analysis is to determine the appropriate level of scrutiny to apply. Limon argues that under the holding in *Lawrence* the highest level of scrutiny should apply because the statute creates a classification of homosexuals which the *Lawrence* Court recognized as suspect. Contrary to this argument, the United States Supreme Court has not recognized homosexuals as a suspect classification. In addition, as Justice Scalia notes in his dissenting opinion in *Lawrence*, "Though there is discussion of 'fundamental proposition[s]' and 'fundamental decisions,' nowhere does the Court's opinion declare that homosexual sodomy is a 'fundamental right.' " 539 U.S. at 586 (Scalia, J., dissenting). See *Lofton v. Secretary of Dept. of Children & Family*, 358 F.3d 804, 817 (11th Cir. 2004) (concluding it would be "a strained and ultimately incorrect reading of *Lawrence* to interpret it to announce a new fundamental right"); *Standhardt v. Superior Court ex rel. County of Maricopa*, 206 Ariz. 276, 77 P.3d 451 (2003), *rev. denied* May 26, 2004 (no fundamental right to same-sex marriage where *Lawrence* did not recognize fundamental right to engage in same-sex sexual conduct). Thus, strict scrutiny does not apply to our analysis of whether the Romeo and Juliet provision unconstitutionally discriminates based upon sexual orientation.

Justice O'Connor, in her concurring opinion in *Lawrence*, suggests "a more searching form of rational basis review" applies when a law exhibits a "desire to harm a politically unpopular group." 539 U.S. at 580 (O'Connor, J., concurring). Her suggestion was not

discussed by the *Lawrence* majority, which did not analyze the Texas statute on equal protection grounds. The majority did note that the "alternative" argument that the Texas statute was invalid under the Equal Protection Clause

"is a tenable argument, but we conclude the instant case requires us to address whether *Bowers* itself has continuing validity. Were we to hold the statute invalid under the Equal Protection Clause some might question whether a prohibition would be valid if drawn differently, say, to prohibit the conduct both between same-sex and different-sex participants." 539 U.S. at 574-75.

Despite not deciding the case on equal protection grounds and never explicitly identifying the standard utilized for its due process analysis, the *Lawrence* majority, by approvingly citing and discussing the equal protection analysis in *Romer*, at least implied that the rational basis test is the appropriate standard when a statute is attacked because of its classification of homosexual conduct. In *Romer*, the Court considered whether "Amendment 2" to the Colorado Constitution, which prohibited government protection of the status "homosexual, lesbian, bisexual orientation, conduct, practices or relationships," violated the Equal Protection Clause. In *Lawrence*, the Court summarized the *Romer* decision, noting that the amendment named a "solitary class . . . and deprived them of protection under state antidiscrimination laws. We concluded that the provision was 'born of animosity toward the class of persons affected' and further that it had no rational relation to a legitimate governmental purpose." 539 U.S. at 574.

The *Lawrence* opinion contains another oblique indication that the rational basis test would apply, stating: "The Texas statute furthers no *legitimate* state interest which can justify its intrusion into the personal and private life of the individual." 539 U.S. at 578. (Emphasis added.) Typically, a search for a legitimate interest signifies a rational basis analysis.

Hence, we apply the rational basis test to determine whether the Romeo and Juliet statute is unconstitutional because of its exclusion of homosexual conduct.

### Rational Basis Test

The Court of Appeals applied the rational basis test and upheld the statute upon finding minimal congruence between the classi-

fying means and the one legislative end upon which the two judges who comprised the majority could agree: public health.

As the Court of Appeals noted, the basic contours of the rational basis test are well-defined: "For a statute to pass constitutional muster under the rational basis standard, it therefore must meet a two-part test: (1) It must implicate legitimate goals, and (2) the means chosen by the legislature must bear a rational relationship to those goals." *Mudd v. Neosho Memorial Regional Med. Center*, 275 Kan. 187, 198, 62 P.3d 236 (2003).

In explaining the test, the United States Supreme Court has said that, although the rational basis test is "the most deferential of standards, we insist on knowing the relation between the classification adopted and the object obtained." *Romer*, 517 U.S. at 632. The Court observed that the "search for the link between classification and objective gives substance to the Equal Protection Clause; it provides guidance and discipline for the legislature . . . ; and it marks the limits of our own authority." 517 U.S. at 632. The Court continued: "By requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law. . . . 'If the adverse impact on the disfavored class is an apparent aim of the legislature, its impartiality would be suspect.' " 517 U.S. at 633 (quoting *U.S. Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 181, 66 L. Ed. 2d 368, 101 S. Ct. 453 [1980]) (Stevens, J., concurring).

*Romer* and other United States Supreme Court decisions instruct that we must examine the scope of the classification. Over-inclusiveness, where the legislation burdens a wider range of individuals than necessary given the State's interest, may be particularly invidious and unconstitutional. *Romer*, 517 U.S. at 632. Likewise, a failure to create a classification which is sufficiently broad to effectively accommodate the State's interest, *i.e.*, the creation of an under-inclusive class, may evidence an animus toward those burdened. *Cleburne*, 473 U.S. at 450. Paradoxically, a class may be both under- and over-inclusive; Limon argues the Romeo and Juliet statute creates such a class.

Justice O'Connor, in her concurring opinion in *Lawrence*, cites and synthesizes four cases which illustrate these points:

"In *Department of Agriculture v. Moreno*, [413 U.S. 528, 534, 37 L. Ed. 2d 782, 93 S. Ct. 2821 (1973),] for example, we held that a law preventing those households containing an individual unrelated to any other member of the household from receiving food stamps violated equal protection because the purpose of the law was to " 'discriminate against hippies.' " 413 U.S. at 534. The asserted governmental interest in preventing food stamp fraud was not deemed sufficient to satisfy rational basis review. [413 U.S. at 535-38]. In *Eisenstadt v. Baird*, 405 U.S. 438, 447-455, [31 L. Ed. 2d 349], 92 S. Ct. 1029 (1972), we refused to sanction a law that discriminated between married and unmarried persons by prohibiting the distribution of contraceptives to single persons. Likewise, in *Cleburne v. Cleburne Living Center*, we held that it was irrational for a State to require a home for the mentally disabled to obtain a special use permit when other residences—like fraternity houses and apartment buildings—did not have to obtain such a permit. And in *Romer v. Evans*, we disallowed a state statute that 'impos[ed] a broad and undifferentiated disability on a single named group'—specifically, homosexuals. 517 U.S. at 632." *Lawrence*, 539 U.S. at 580 (O'Connor, J., concurring).

Of the four cases Justice O'Connor discusses, two are particularly analogous to this case. As Justice O'Connor indicated, in *Eisenstadt v. Baird*, 405 U.S. 438, 31 L. Ed. 2d 349, 92 S. Ct. 1029 (1972), the Court invalidated on rational basis grounds a Massachusetts statute banning the distribution of contraceptives to unmarried persons. The state's highest court had found the legislative purpose to be "the State's interest in protecting the health of its citizens" by "preventing the distribution of articles designed to prevent conception which may have undesirable, if not dangerous, physical consequences" and "to protect morals" by discouraging premarital sexual intercourse. 405 U.S. at 442. Addressing the purpose of preventing premarital sex, the Supreme Court concluded: " 'The rationality of this justification is dubious, particularly in light of the admitted widespread availability to all persons . . . , unmarried as well as married, of birth-control devices for the prevention of disease, as distinguished from the prevention of contraception.' " 405 U.S. at 448-49 (quoting *Griswold v. Connecticut*, 381 U.S. 479, 498, 14 L. Ed. 2d 510, 85 S. Ct. 1678 [1965] [Goldberg, J., concurring]). The Court concluded that "the Massachusetts stat-

ute is thus so riddled with exceptions that deterrence of premarital sex cannot reasonably be regarded as its aim." 405 U.S. at 449.

The *Eisenstadt* Court also explained, if the State genuinely considered contraceptives to pose a health risk, it would have banned their use by both married and unmarried persons. Protecting only single persons from the alleged dangers of contraceptives, and even then only when used to prevent pregnancy rather than the spread of disease, was "both discriminatory and overbroad" and "illogical to the point of irrationality." *Eisenstadt*, 405 U.S. at 450-51.

In the other case cited by Justice O'Connor which is particularly analogous, *Romer*, the Court was reviewing the Colorado constitutional amendment which the State argued protected the associational rights of landlords and employers with moral objections to homosexuality and furthered the State's interest in "conserving resources to fight discrimination against other groups." *Romer*, 517 U.S. at 635. The Court found it "impossible to credit" these proffered purposes. 517 U.S. at 635. Noting that rational basis inquiry was meant to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law," 517 U.S. at 633, the Court held that

"[e]ven laws enacted for broad and ambitious purposes often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons. Amendment 2, however, in making a general announcement that gays and lesbians shall not have any particular protections from the law, inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justification that may be claimed for it." 517 U.S. at 635.

The Court faulted the Colorado constitutional amendment for imposing a "broad and undifferentiated disability on a single named group." 517 U.S. at 632. The Court further condemned the statute because "its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects." 517 U.S. at 632. Additionally, the amendment was "a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." 517 U.S. at 635. Because of these faults, the Court reached "the inevitable inference that the disadvantage imposed is born of animosity toward the class of

persons affected." 517 U.S. at 634. " '[D]esire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.' " 517 U.S. at 634 (quoting *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528, 534, 37 L. Ed. 2d 782, 93 S. Ct. 2821 [1973]). The result of these deficiencies was that, whatever else might be said of the amendment, it "offended" the "conventional and venerable" principle that "a law must bear a rational relationship to a legitimate governmental purpose." 517 U.S. at 635.

With these holdings to direct us, we begin our search for a rational basis for the harshly disparate sentencing treatment of those 18 years old and younger who engage in voluntary sex with an underage teenager of the same sex.

### Legislative History

Although the legislature need not have articulated the basis for the classification the State relies upon when the classification is challenged, we begin with an examination of the legislative record to determine if a purpose for the classification is suggested therein.

The Kansas unlawful voluntary sexual relations (Romeo and Juliet) statute was originally drafted as an amendment to K.S.A. 21-3520, rather than as a free-standing statute. See L. 1999, ch. 164, sec. 38; 1999 S.B. 131. As it appeared in S.B. 131, the provision contained no requirement that the prohibited activity occur between members of the opposite sex. In other words, it would not have differentiated between a Romeo and Juliet relationship, a Romeo and Romeo relationship, or a Juliet and Juliet relationship.

The Kansas Sentencing Commission, which drafted the bill, offered the following testimony with regard to the provision:

"Numerous concerns have been raised by judges on the sentencing when the parties are in a mutual relationship and the parents or other parties initiate prosecution. This would allow for the sanctioning of the activity as a person felony, but would designate a presumptive nonprison sentence. In addition, a conviction under this new section would not require the offender to register as a sex offender, which may result in long term consequences." Testimony on S.B. 131 before the House Judiciary Committee, March 16, 1999.

The Commission also noted that the provision was one of several recommendations that attempted to address proportionality issues.

The Commission's recommendations were based on the guiding principles that incarceration should be reserved for the most violent and chronic offenders and that the length of sentences should increase in proportion to the severity of the offense, with loss of human life being the most severe threat to public safety. Testimony on S.B. 131 before the House Judiciary Committee, March 16, 1999.

There was significant opposition to the provision, although none of the recorded criticism faulted the statute for not containing language limiting the provision to heterosexual teen relations. The Kansas County & District Attorneys Association offered the following testimony opposing the provision:

"[W]e are opposed to the provisions that distinguish sex crimes based on the offender's age on two grounds:

"1. POLICY. A crime is a crime, whether committed by a 19-year-old or a 22-year-old, and, historically, the offender's age has only determined whether the case is filed in juvenile or adult court. As the attached testimony submitted by the Reno County Attorney there is a strongly-held belief that there are predatory relationships out there, regardless of the proximity in age between predator and victim. Those cases truly involving Romeo and Juliet are better left to prosecutor discretion; or more correctly victim and police discretion, since the prosecutor rarely hears about true Romeo and Juliet situations. Likewise, the bundling of the various consensual sex acts between Romeo and Juliet into a single crime is indicative that the State makes no distinction between heavy petting, sodomy or intercourse. Those . . . involved in the problem of teen pregnancy would beg to differ with that decision.

"2. LEGAL. . . . What is the state interest in making a distinction based on the difference in age? Is the victim less fondled or, in the extreme case, made less pregnant, simply because a defendant is near her own age? . . ." Testimony on S.B. 131 before the House Judiciary Committee, March 16, 1999.

The Reno County Attorney testified that the law "will send a dangerous message to the young men and women of this State . . . that fourteen and fifteen year old girls are entitled to less protection and it is somehow less of an offense if the perpetrator happens to be near them in age." He noted that not all sexual relations between teenagers involve romantic relationships. Testimony on S.B. 131 before the Senate Judiciary Committee, February 11, 1999. Representatives of the Kansas Peace Officers' Association and the Attorney General also opposed the provision,

objecting on similar grounds. Kansas Peace Officers' Testimony on S.B. 131 before the House Judiciary Committee, March 16, 1999; Attorney General's Testimony on S.B. 131 before the Senate Judiciary Committee, February 11, 1999.

After S.B. 131 received hearings in committee and was reported to the Senate, the Senate passed the bill on a vote of 35 "ayes" and 5 "nays." Sen. J., 1999, p. 242. Although S.B. 131 was heard by the House Judiciary Committee, the House did not take final action on the bill. Eventually, in conference committee, the provisions of S.B. 131 were amended into 1999 S.B. 149. At that point, the phrase limiting the statute to relations between members of the opposite sex, making it a true Romeo and Juliet statute, was added along with other revisions not relevant to the facts of this case. See House J., 1999, p. 1165. Although the version of the Romeo and Juliet law which appears in S.B. 149 is different from the one contained in S.B. 131, there are no minutes reflecting how or why it was changed to include the "opposite sex" language. S.B. 149, and previously S.B. 131, contained many other juvenile and crime provisions. When the Senate voted to accept the conference report, 30 "yea" votes and 9 "nay" votes were cast. Sen. J., 1999, p. 1003.

As this review of the legislative history reflects, there is nothing in the legislative record regarding the legislative purpose for adding the opposite sex requirement. The only legislative purposes recorded relate to the general goal of less harsh punishment for those 18 years old and younger who had voluntary sex with another teen who was at least 14 and the goal of adjusting sentence disparities. It was opponents to the legislation who raised public health and moral concerns and none of them related to the difference between heterosexual and homosexual conduct.

Although the legislative history does not suggest the State's interest in including the phrase "and are members of the opposite sex," the State argues several possibilities. In addition, we must consider the rationales utilized by the Court of Appeals majority. These various possible State interests can be categorized as: (1) the protection and preservation of the traditional sexual mores of society; (2) preservation of the historical notions of appropriate sexual development of children; (3) protection of teenagers against co-

ercive relationships; (4) protection of teenagers from the increased health risks that accompany sexual activity; (5) promotion of parental responsibility and procreation; and (6) protection of those in group homes.

### Traditional Sexual Mores and Development

Limon counters this theoretical justification by arguing that the State's moral disapproval of homosexuality is an illegitimate justification for discrimination.

The *Lawrence* decision rejected a morality-based rationale as a legitimate State interest. The Court recognized that many people condemn homosexuality as immoral:

"[T]he Court in *Bowers* was making the broader point that for centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives." 539 U.S. at 571.

However, the Court continued by stating: "These considerations do not answer the question before us." 539 U.S. at 571. The Court framed the issue as "whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law. 'Our obligation is to define the liberty of all, not to mandate our own moral code.' *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 850[, 120 L. Ed. 2d 674, 112 S. Ct. 2791] (1992)." 539 U.S. at 571.

Thus, when Texas argued that its anti-sodomy law furthered the promotion of morality (539 U.S. at 582 [O'Connor, J., concurring]), the Court in *Lawrence* rejected the argument and adopted the following reasoning from Justice Stevens' dissent in *Bowers*: " '[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice.' " 539 U.S. at 577 (quoting *Bowers*, 478 U.S. at 216 [Stevens, J., dissenting]).

This holding followed the precedent of *Casey, Eisenstadt, Romer*, and other cases. The Court in *Romer* explained that our

laws are often morality-based which, in and of itself, is not objectionable if the laws are applied fairly to all. However, the right to equal protection of those laws is offended when legal classifications are drawn for the purpose of invoking moral disapproval with "the purpose of disadvantaging the group burdened by the law." *Romer*, 517 U.S. at 633.

The Court of Appeals majority would dismiss this analysis in *Lawrence* because of the due process context in which the discussion was made. The *Lawrence* majority, however, signaled application of the principles to equal protection analysis: "Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests." 539 U.S. at 575. In essence, the *Lawrence* decision recognized that the substantive due process analysis at issue in that case and the equal protection analysis necessary in this case are inevitably linked.

This court has described this link as follows:

"The difference between the constitutional concepts of due process and equal protection is that due process emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation are treated, while equal protection emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable. *The test in determining the constitutionality of a statute under due process or equal protection concepts weighs almost identical factors.*" (Emphasis added.) *Chiles v. State*, 254 Kan. 888, Syl. ¶ 10, 869 P.2d 707 (1994).

Thus, we are directed in our equal protection analysis by the United States Supreme Court's holding in *Lawrence* that moral disapproval of a group cannot be a legitimate governmental interest.

*Historical Notions of Appropriate Sexual Development of Children*

The Court of Appeals also determined the *Lawrence* holding did not apply to this case because *Lawrence* involved adults and this case involved an adult in a relationship with a minor. Likewise, the State focuses its argument on the State's interest in the moral and sexual development of children.

Undoubtedly, the State has broad powers to protect minors. This point was noted by the United States Supreme Court in *Carey v. Population Services International*, 431 U.S. 678, 52 L. Ed. 2d 675, 97 S. Ct. 2010 (1977). *Carey* involved a constitutional challenge to a prohibition on distribution of contraceptives to persons under 16 years of age. The appellants argued that the free availability of contraceptives might encourage sexual activity among minors and the State had a legitimate interest in discouraging such behavior. In response, the appellees argued that minors as well as adults had a privacy right to engage in consensual sexual behavior. The *Carey* court noted that "in the area of sexual mores, as in other areas, the scope of permissible state regulation is broader as to minors than as to adults." 431 U.S. at 694 n.17.

However, *Carey* held that "the right to privacy in connection with decisions affecting procreation extends to minors as well as adults" and invalidated the prohibition in question. 431 U.S. at 693. The Court noted that "State restrictions inhibiting privacy rights of minors are valid only if they serve 'any significant state interest . . . that is not present in the case of an adult.' [Citation omitted.]" 431 U.S. at 693.

Although this case does not involve the fundamental right to privacy in connection with decisions affecting procreation or legislation which inhibits the rights of minors, the *Carey* rationale suggests that even when the articulated interest is the protection of minors, there still must be a connection between the State's interest and the classification and, if the burden would not be allowed if placed upon an adult, the State's interest must be unique to children. So, unless the justifications for criminalizing homosexual activity between teenagers more severely than heterosexual activity between teenagers are somehow different than the justifications for criminalizing adult homosexual activity, those justifications must fail.

Neither the Court of Appeals nor the State cites any scientific research or other evidence justifying the position that homosexual sexual activity is more harmful to minors than adults.

After this court accepted review of the Court of Appeals decision, the National Association of Social Workers and the Kansas

Chapter of the National Association of Social Workers filed an *amici* brief which specifically questions the Court of Appeals' conclusion that the exclusion of gay teens from the application of the unlawful sexual relations statute protects the traditional sexual development of children. That brief cites a number of studies indicating that sexual orientation is already settled by the time a child turns 14, that sexual orientation is not affected by the sexual experiences teenagers have, and that efforts to pressure teens into changing their sexual orientation are not effective.

We conclude, as the United States Supreme Court stated in *Romer*, the "status-based enactment [is so] divorced from any factual context" we cannot "discern a relationship" to the espoused State interest (*Romer*, 517 U.S. at 635) that the law preserves the sexual development of children consistent with traditional sexual mores. Additionally, we again recognize the *Lawrence* Court's conclusion that moral disapproval of a group cannot be a legitimate governmental interest.

### Coercive Effect Upon Minors

The State at various times refers to the coercive effect often existing in a relationship between an adult and a child. Certainly, the State has a significant interest in prohibiting sex between adults and minors, not only because of the potentially coercive effect of an adult's influence but also because of concern regarding the minor's ability to arrive at an informed consent. These concerns are addressed by and form the fundamental policy rationale of statutory rape provisions. Limon's argument accepts and supports this State interest; he agrees he deserves punishment. He simply disputes that he should be punished more severely for having sex with a member of the same sex.

Additionally, the policy decision made by the legislature in enacting the Romeo and Juliet statute undercuts this argument. The legislature determined, at least as to those in a heterosexual relationship, that a mutual relationship between teenagers is less likely to involve the same coercion that a relationship between an older adult and a child might and is more likely to be one where the minor's participation is voluntary, although not legally consensual.

This, however, begs the question of whether there is a rational basis to distinguish between a class of those 18 years old and younger who engage in voluntary sex with minors aged 14 or 15 who are of the same sex and a class of those 18 years old and younger who engage in voluntary sex with such minors of the opposite sex. We see no basis to determine that as a class one group or the other would have a higher tendency to be coercive. A distinction on this basis has no factual support.

The State makes the same argument in a narrower fashion as applied to the facts of this case, stating the activity between Limon and M.A.R. was "less than consensual and more likely coercive." Where the State stipulated below that the sexual activity between Limon and M.A.R. was consensual, it cannot be heard to argue on appeal that Limon's actions were "coercive and predatory." We agree the wording in the stipulation that the oral sex between Limon and M.A.R. was "consensual" was a legal misnomer and a better term would have been "voluntary," but that distinction does not permit the State to back away from its stipulation at this stage of the case.

### Public Health

As to the public health justification, Limon argues that excluding gay teenagers from the lesser penalties of the Romeo and Juliet law has no connection with the State's interest in reducing the spread of sexually transmitted diseases. Specifically, the State focuses upon the risks of HIV and in support of its argument cites briefs filed before the United States Supreme Court in the *Lawrence* case.

We first note that there is no basis to determine that public health risks for minors engaging in same-gender sexual relations is greater than the risk for adults. That *Lawrence* did not discuss the often-cited justifications of public health and morality tells us that those interests are either not legitimate interests at all, or more likely, that they are not sufficient to overcome an individual's right to liberty and privacy.

At a minimum, we cannot distinguish between the health risks for the adults involved in *Lawrence* and the minor involved in this

case. Additionally, we find persuasive Limon's argument that for this justification to be rational, the prohibited sexual activities would have to be more likely to transmit disease when engaged in by homosexuals than by heterosexuals; however, this proposition is not grounded in fact.

Again, we have the benefit of additional arguments, including the *amici curiae* brief of a number of public health organizations which provided scientific and statistical information. These studies persuade us that the Romeo and Juliet statute presents one of those seemingly paradoxical situations where the classification is both over- and under-inclusive.

Using statistics from the United States Centers for Disease Control and Prevention (CDC) and other studies, the *amici* support the argument that the Court of Appeals majority and the State focus on the wrong population in citing the statistics regarding the incidence of HIV infection in adult homosexual males. Significantly, they point to the CDC's Basic Statistics which reflect that among the population of HIV-positive young people ages 13-19, which includes the age range covered by the Romeo and Juliet statute, 61 percent are female. Yet, the risk of transmission of the HIV infection through female to female contact is negligible. Recognizing that HIV is transmitted through intravenous drug use of shared needles and other mechanisms besides sexual transmission, the gravest risk of sexual transmission for females is through heterosexual intercourse.

There is a near-zero chance of acquiring the HIV infection through the conduct which gave rise to this case, oral sex between males, or through cunnilingus. And, although the statute grants a lesser penalty for heterosexual anal sex, the risk of HIV transmission during anal sex with an infected partner is the same for heterosexuals and homosexuals.

The legislative history reveals that the concern of conferees was more focused upon teenage pregnancy. Obviously, this public health risk is not addressed through this legislation. According to the Kansas Department of Health and Environment's Teenage Pregnancy Report for 2003, there were 1,559 pregnancies in Kansas teens age 15 to 17. In contrast, the same agency reports that

from 2000 to 2002 there were two cases of AIDS in Kansas among teenagers 13-19 years old.

Dissenting Judge Pierron cited several scenarios in which the statute did not protect against activities which raise a public health risk. In part, he stated:

"[U]nder the law a female infected with every venereal disease yet identified, and engaging in acts quite likely to infect or actually infecting a male minor, will receive a much lighter sentence. A disease-free male engaging in sex with another male in a manner not likely to spread disease if it was present will receive a much heavier sentence. Perversely, under the law, a male with a venereal disease who infects and impregnates an underage female will also receive a much lighter sentence." 32 Kan. App. 2d at 397-98.

In essence, the Romeo and Juliet statute is over-inclusive because it increases penalties for sexual relations which are unlikely to transmit HIV and other sexually transmitted diseases. Thus, the statute burdens a wider range of individuals than necessary for public health purposes. Simultaneously, the provision is under-inclusive because it lowers the penalty for heterosexuals engaging in high-risk activities. In other words, the statute proscribes conduct unrelated to a public health purpose and does not proscribe conduct which is detrimental to public health.

Thus, the conclusions of the *Romer* Court are, again, particularly salient. The status-based distinction in the Kansas Romeo and Juliet statute is so broad and so divorced from supporting facts that we cannot discern a relationship to the facially legitimate interest of protecting public health and "its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects." 517 U.S. at 632. The "statute's superficial earmarks as a health measure" (*Eisenstadt,* 405 U.S. at 452) do not satisfy scrutiny under the rational basis test.

### Promoting Parental Responsibility and Procreation

Limon also contends that there is no rational connection between the classification and the Court of Appeals' parental responsibility and procreation justifications. The Court of Appeals stated that the legislature might have determined that lengthy incarcer-

ation of a young adult offender who has become a parent as a result of a heterosexual relationship with a minor would be counterproductive to that young adult's duty to support his or her child. But, because same-sex relationships do not lead to unplanned pregnancies, the need to release a same-sex offender from incarceration is absent.

Limon argues this justification and Judge Green's findings regarding the State's interest in relationships which lead to procreation make no sense since the State's interest is to discourage teen pregnancies, not encourage them. Further, the statute does not reduce penalties solely for conduct that results in pregnancy, but also for heterosexual intercourse which does not result in pregnancy, *i.e.*, sodomy and lewd contact. Again, the relationship between the objective and the classification is so strained that we cannot conclude it is rational.

### Protection of Those in Group Homes

The State also makes an argument that the State has an interest in gender segregation in group homes. The Romeo and Juliet statute has no limitation related to living arrangements or disability. If the statute punished similar behavior in segregated group homes for juveniles, the State's argument could conceivably justify a harsher penalty. However, the statute is not limited in this manner. If the legislative purpose is to protect those in group homes, the statute's overbreadth in covering situations both inside and outside residential living environments suggests animus toward teenagers who engage in homosexual sex. See *Romer*, 517 U.S. at 632.

### No Rational Basis

We conclude that K.S.A. 2004 Supp. 21-3522, the Kansas unlawful voluntary sexual relations statute, does not pass rational basis scrutiny under the United States Constitution Equal Protection Clause or, because we traditionally apply the same analysis to our state constitution, under the Kansas Constitution Equal Protection Clause. The Romeo and Juliet statute suffers the same faults as found by the United States Supreme Court in *Romer* and *Eisenstadt*; adding the phrase "and are members of the opposite sex"

created a broad, overreaching, and undifferentiated status-based classification which bears no rational relationship to legitimate State interests. Paraphrasing the United States Supreme Court's decision in *Romer*, the statute inflicts immediate, continuing, and real injuries that outrun and belie any legitimate justification that may be claimed for it. Furthermore, the State's interests fail under the holding in *Lawrence* that moral disapproval of a group cannot be a legitimate governmental interest. As Justice Scalia stated: "If, as the [United States Supreme] Court asserts, the promotion of majoritarian sexual morality is not even a *legitimate* state interest," the statute cannot "survive rational-basis review." 539 U.S. at 599 (Scalia, J., dissenting).

Because we determine the statute violates constitutional equal protection guarantees based upon a rational basis analysis, we need not reach Limon's other arguments that strict scrutiny should be applied, including his argument that the statute discriminates based on sex.

### Appropriate Remedy

Given our holding, we must determine the appropriate remedy. Limon asks this court to: (1) strike the language from the Romeo and Juliet statute that limits its application to members of the opposite sex and (2) reverse and remand this case with instructions that the State initiate any further proceedings under the Romeo and Juliet law within 30 days. The State argues that this court cannot judicially rewrite the statute and contends that, if the court were to declare the challenged classification unconstitutional, it must nullify the statute.

On several occasions, this court has considered severing an unconstitutional provision from a statute and leaving the remainder in force. Each time, we have reiterated that the determination of whether the provision may be severed "depends on the intent of the legislature." *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City*, 264 Kan. 293, Syl. ¶ 16, 955 P.2d 1136 (1998). See, *e.g.*, *State v. Carpenter*, 231 Kan. 235, 240-41, 642 P.2d 998 (1982) (striking phrase from statute as unconstitutionally vague); *Gumbhir v. Kansas State Board of Pharmacy*, 228 Kan. 579, 588,

618 P.2d 837 (1980) (striking phrase from statute which unlawfully delegated legislative power). We have applied the same test when reading judicial requirements into statutes which otherwise were overbroad, if doing so reflects the "manifest intention of the legislature." *State v. Motion Picture Entitled "The Bet,"* 219 Kan. 64, 71, 547 P.2d 760 (1976) (imposing constitutional standard upon statutory definition of "obscene").

When an alteration of a statute — either through striking language or adding judicial requirements to the statute — would be contrary to legislative intent, courts must nullify the statute. This point was emphasized in *State v. Marsh,* 278 Kan. 520, 102 P.3d 445 (2005), *rev'd Kansas v. Marsh,* ___ U.S. ___, 165 L. Ed. 2d 429, 126 S.Ct. 2516 (2006), in which this court nullified the Kansas death penalty statute after finding it unconstitutional. Marsh raised the constitutionality of the statute because the jury had been instructed, consistent with the statute, that the death penalty must be imposed if aggravating and mitigating circumstances weighed equal, in other words were in equipoise. Marsh argued his death sentence must be reversed because this equipoise provision had been found to violate the Eighth Amendment in *State v. Kleypas,* 272 Kan. 894, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002). Marsh also argued that this constitutional infirmity required nullification of the death penalty statute, a result which would require reversing portions of the *Kleypas* decision. Specifically, Marsh argued the *Kleypas* court had erroneously applied precedent and improperly rewritten an unambiguous statute in a manner clearly contrary to legislative intent.

The majority in *Marsh* agreed with this argument. First, the *Marsh* court noted, "the avoidance doctrine [under which courts seek to construe statutes as constitutional] is applied appropriately *only* when a statute is ambiguous, vague, or overbroad." 278 Kan. at 539. The provision of the death penalty statute was not ambiguous, vague, or overbroad. The express language adopted by the legislature made it clear that the legislature intended to mandate the imposition of a death sentence where the existence of aggravating circumstances is not outweighed by any mitigating circumstances found to exist. In other words, there was no ambiguity and, therefore, no basis to apply rules of statutory construction. Second,

the *Marsh* court, citing decisions of this court and of the United States Supreme Court, reiterated the long-standing and well-established rule that a court can only " 'construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute.' " 278 Kan. at 539. The majority concluded that the statutory construction adopted in *Kleypas* was not within the apparent intent of the legislature. The legislative history of the death penalty statute showed that the attorney general had presented the legislature the precise question of whether the equipoise provision was constitutional. The attorney general recommended that the statute provide that the aggravating circumstances must outweigh the mitigating circumstances before a death sentence may be imposed and advised that without this change the constitutionality of the statute was in question. Despite this specific recommendation and advice, the legislature did not act on the attorney general's advice. 278 Kan. at 540. Thus, to read the statute in the manner suggested in *Kleypas* was contrary to legislative intent. The *Marsh* court concluded it was a violation of the separation of powers doctrine for the court to rewrite a statute in a manner so clearly contrary to the legislative intent. The only option in such a situation is to nullify the statute.

In this case, it is the State suggesting that the statute must be nullified if found unconstitutional. Limon, noting that the statute is overbroad, thus making it appropriate for the court to consider the remedy of striking language, suggests there is evidence of a legislative intent to have the offending language struck rather than to nullify the entire provision. He points to the severance provision within the sex crimes statutes.

We have noted that, although our decision to strike language is not dependent upon the presence of a severance provision, "[t]he enactment of a severability clause in a statute or series of statutes evidences the intent of the legislature that if some portion or phrase in the statute is unconstitutional, the balance shall be deemed valid." *State v. Next Door Cinema Corp.*, 225 Kan. 112, Syl. ¶ 8, 587 P.2d 326 (1978). In this case there is an applicable severability provision which applies to all sex crimes and provides: "If any provision of this act is held to be invalid or unconstitutional, it shall

be conclusively presumed that the legislature would have enacted the remainder of this act without such invalid or unconstitutional provision." K.S.A. 2004 Supp. 21-3521. The severability clause was already in place (it was enacted in 1998) at the time the Romeo and Juliet law was enacted in 1999. Thus, it is conclusively presumed the legislature would have enacted the statute even if it did not include the phrase "and are members of the opposite sex."

There are other considerations which also lead us to conclude that the legislative intent would be to strike the offending language rather than nullify the entire statute. These considerations were discussed in *State v. Denney*, 278 Kan. 643, 101 P.3d 1257 (2004). At issue in *Denney* was whether there was an equal protection violation because K.S.A. 21-3502 allowed postconviction DNA testing in a rape case but not in an aggravated criminal sodomy case. After concluding there was no rational basis for allowing DNA testing for rapists but not allowing testing for Denney who had penetrated a female's anus with his penis, we concluded the statute was under-inclusive.

In considering a remedy, we extensively discussed applicable general rules and specifically examined use of those rules in two cases: *Califano v. Westcott*, 443 U.S. 76, 61 L. Ed. 2d 382, 99 S. Ct. 2655 (1979), and *People v. Liberta*, 64 N.Y.2d 152, 474 N.E.2d 567 (1984). We need not repeat the full discussion here. Summarizing that discussion, we stated:

"[T]he question before us is whether the Kansas Legislature would prefer to have statutes which cover DNA testing for those convicted of aggravated criminal sodomy like Denney, or instead to have no statutes providing for postconviction DNA testing. To answer this question, we first consider the legislative purpose. . . . We next consider the public's needs. . . .

"As an additional consideration, we also examine the overall statutory scheme." *Denney*, 278 Kan: at 659-60.

In this case, the first two inquiries mentioned—legislative purpose and public need—are closely related. As previously discussed, the principal legislative purposes of the Romeo and Juliet statutes were to accommodate the situation where a teen relationship reduces the level of coercion potentially involved in a sexual relationship between an adult and a minor and to adjust the propor-

tionality of sentences. These purposes are not harmed by striking the language and, some would argue, are actually furthered through the revision.

The next consideration under *Denney* is the overall statutory scheme. We have stated: "Where parts of a statute or a section of a statute can be readily separated, then the part which is constitutional may stand while the unconstitutional part is rejected." *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City*, 264 Kan. at 316. In this case, the phrase "and are members of the opposite sex" can readily be struck without creating an ambiguous statute.

In *State ex rel. Tomasic* we also noted that, if from the legislative scheme "it can be said that the act would have been passed without the objectionable portion and if the statute would operate effectively to carry out the intent of the legislature with such portion stricken, the remainder of the law will stand as valid." 264 Kan. 293, Syl. ¶ 16.

In this case, we are assisted in this inquiry by the legislative history, specifically, the Senate vote on S.B. 131, which did not include the language that makes the provision unconstitutional. The Senate approved that proposal on a vote of 35 "ayes" to 5 "nays." Sen. J., 1999, p. 242. Hence, although a vote was not taken in both chambers of the legislature on S.B. 131, we know that the Senate, at least, supported the legislation without the offending language—indeed, with more yea votes than the measure drew once the offending language had been added.

From this examination, we conclude that several factors—the severability clause, the legislative purposes, the public need, the legislative scheme, and the legislative history—reveal that striking the offending language rather than nullifying the statute would be consistent with legislative intent.

### Conclusion of Equal Protection Analysis

We hold K.S.A. 2004 Supp. 21-3522 unconstitutional as violating the equal protection provisions of the United States and Kansas Constitutions and strike from the statute the words "and are members of the opposite sex." We further hold that Limon's conviction

and sentence for criminal sodomy pursuant to K.S.A. 21-3505(a)(2) violate his right to equal protection of the laws.

We further grant Limon's requested remedy of imposing a time limit upon further proceedings in this case and order that the State will have 30 days in which to: (1) charge Limon under the provisions of K.S.A. 2004 Supp. 21-3522 without the words "members of the opposite sex" or (2) take other action.

Because we reach these holdings, we need not decide Limon's argument that his sentence was cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

### Apprendi Argument

We must, however, consider one additional issue raised by Limon. He contends that increasing his sentence based on his prior juvenile adjudications violates the principles of *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *State v. Gould*, 271 Kan. 394, 23 P.3d 801 (2001). Limon recognizes that this argument was rejected in *State v. Hitt*, 273 Kan. 224, 235-36, 42 P.3d 732 (2002), *cert. denied* 537 U.S. 1104 (2003), but raises the issue to preserve it for future review in the federal courts and to give this court a chance to reconsider *Hitt*.

*Hitt* held that juvenile adjudications "enjoy ample procedural safeguards" and are encompassed in the *Apprendi* exception for prior crimes. 273 Kan. at 236. This court has declined to overrule *Hitt* as recently as June 2004. See *State v. Carter*, 278 Kan. 74, 91 P.3d 1162 (2004).

More importantly, Limon did not raise this issue before the Court of Appeals; thus the issue is not properly before this court. See *State v. Layton*, 276 Kan. 777, 784, 80 P.3d 65 (2003) (where issue raised in petition for review was neither presented to nor decided by Court of Appeals, issue was not properly before this court).

Reversed and remanded with directions.

DAVIS, J., and GERNON, J., not participating.

LARSON, S.J., assigned.