No. 116,842

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

FRANCISCO PARDO,
*Appellant*,

v.

UNITED PARCEL SERVICE
and
LIBERTY MUTUAL INSURANCE CORPORATION,
*Appellees*.

SYLLABUS BY THE COURT

1.

Section 18 of the Kansas Constitution Bill of Rights guarantees an individual's right to a remedy: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law." It has long been held that the words "remedy by due course of law" mean the reparation for injury, ordered by a tribunal having jurisdiction, in due course of procedure and after a fair hearing.

2.

Section 5 of the Kansas Constitution Bill of Rights states: "The right of trial by jury shall be inviolate."

3.

The Fourteenth Amendment to the United States Constitution states, in pertinent part, that no State shall "deprive any person of life, liberty, or property without due process of law." Due process emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated.

1

4.

No one has a vested right in common-law rules governing negligence actions which would preclude substituting a viable statutory remedy for one available at common law. The Legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed or abolished.

5.

If a remedy protected by due process is abrogated or restricted by the Legislature, such a change is constitutional if the change is reasonably necessary in the public interest to promote the general welfare of the people of the state and the Legislature provides an adequate substitute remedy to replace the restricted remedy.

6.

The first step in determining if the Legislature has provided an adequate substitute remedy is whether the change is reasonably necessary in the public interest to promote the general welfare of the people of the state. Another way to state this test is whether the legislative means selected has a real and substantial relation to the objective sought. Under this reasonable basis test, it is unnecessary to ascertain the specific purpose the Legislature espoused, if any, in establishing the challenged statute because the Legislature is not required to articulate reasons for enacting a statute. It is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged statute actually motivated the Legislature. Accordingly, to supply a rationalization for a challenged statute, all the State has to do is offer any set of facts which reasonably may be conceived to justify it.

7.

Even if the modification of a remedy is consistent with public policy, this does not necessarily satisfy due process concerns. In order to insure due process under the second step, the Legislature is required to provide an adequate substitute remedy when a

common-law remedy is modified, restricted, or abolished. If a subsequent legislative change reduces the remedy or makes the remedy more difficult to obtain, a court must determine if that revision no longer provides an adequate substitute remedy, thereby making the quid pro quo inadequate and violating due process.

8.

Major statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparation in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo. In considering the adequacy of the quid pro quo, no hard and fast rule can apply to all cases.

9.

There is a limit which the Legislature may not exceed in altering the statutory remedy previously provided when a common-law remedy was statutorily abolished. The Legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and sufficient substitute remedy.

10.

K.S.A. 2014 Supp. 44-510d(b)(23) is unconstitutional as applied to this claimant-employee because it prohibits the employee from recovering an award for his permanent partial disability from a new and distinct work-related injury. There can be no adequate substitute remedy for an employee's right to sue his employer for negligence and potentially recover an award at common law, when there is no remedy provided the employee under the Workers Compensation Act.

3

11.

Under the facts of this case, severing the unconstitutional portion of K.S.A. 2014 Supp. 44-510d(b)(23) is the most appropriate remedy as it best preserves the Legislature's intent, renders the statute constitutional in part, provides the most guidance for the administrative proceedings, and supplies the injured employee with an adequate remedy.

Appeal from Workers Compensation Board. Opinion filed June 1, 2018. Reversed and remanded with directions.

*Keith L. Mark*, of Mark & Burkhead, of Mission, for appellant.

*Douglas M. Greenwald*, *Karl L. Wenger*, and *Frederick J. Greenbaum*, of McAnany, Van Cleave & Phillips, P.A., of Kansas City, for appellees.

*Miriam E. C. Bailey*, of Polsinelli PC, of Kansas City, Missouri, for amicus curiae The Kansas Chamber of Commerce.

*William Rich*, of Washburn University School of Law, Topeka, and *Jan L. Fisher*, of McCullough, Wareheim & LaBunker, of Topeka, for amici curiae Professors William Rich and Jan L. Fisher.

*Dwight R. Carswell* and *Bryan C. Clark*, assistant solicitors general, *Jeffrey A. Chanay*, chief deputy attorney general, and *Derek Schmidt*, attorney general, for amicus curiae State of Kansas.

Before POWELL, P.J., STANDRIDGE, J., and STUTZMAN, S.J.

POWELL, J.: Francisco Pardo brings this appeal challenging the constitutionality of K.S.A. 2014 Supp. 44-510d(b)(23) as applied to his workers compensation claim. This statute mandates that for all work-related injuries after January 1, 2015, the Sixth Edition of the American Medical Association (AMA) Guides to the Evaluation of Permanent Impairment (6th ed. 2008) must be used in rating a work-related injury to determine a

4

worker's amount of compensation. In 2013 Pardo injured his shoulder in a work-related accident. In March 2015 Pardo injured the same shoulder in another work-related accident. This second injury was unrelated to his first injury and was located in a completely different place on his rotator cuff. Both his own doctor and his employer's doctor determined that Pardo had an additional permanent partial impairment above and beyond the impairment rating he received from his 2013 rotator cuff injury. However, the Sixth Edition mandates that if an individual previously has received an impairment rating on a shoulder, then no subsequent impairment rating may be assessed on the same shoulder. This requirement forced both doctors to issue a 0% impairment rating on Pardo's new and distinct shoulder injury even though they both testified that this was a medically inaccurate and insufficient rating for Pardo's new injury. An administrative law judge (ALJ) for the Division of Workers Compensation issued a zero award for Pardo's new permanent partial impairment as required by the Sixth Edition, and the Workers Compensation Board (Board) affirmed this award.

For reasons we more fully explain below, we agree with Pardo that as applied to him, mandatory use of the Sixth Edition is unconstitutional as it denies him a remedy guaranteed by the Kansas Constitution. Accordingly, we reverse the Board's denial of an award for Pardo's permanent partial impairment and remand the matter for reconsideration under the Fourth Edition of the AMA Guides to the Evaluation of Permanent Impairment (4th ed. 1995).

FACTUAL AND PROCEDURAL BACKGROUND

The facts in this case are not disputed. Pardo has been employed by United Parcel Service, Inc. (UPS) for 13 years and continues to work for UPS today. As a part of his job duties Pardo operates tractor-trailers, picks up and delivers loads, and works in the yard with a spotter. A spotter is a piece of equipment that remains in the yard and is used to move trailers to different locations onsite.

On March 18, 2015, in the course of his job duties, Pardo was climbing onto the spotter when he slipped on oil and grease buildup. Pardo was holding onto the spotter's railing with his left arm when he fell, jerking his left arm. Pardo testified he felt a pop and pull in his left shoulder. Pardo immediately reported the incident and was sent for medical treatment.

Pardo had previously injured his left shoulder in the course of his job duties in July 2013. As a result of that injury, Pardo underwent arthroscopic surgery with board certified orthopedic surgeon Dr. Mark Rasmussen on August 29, 2013. Dr. Rasmussen repaired a partial thickness rotator cuff tear and performed an extensive labrum repair. Dr. Rasmussen released Pardo to full work duty and assessed an impairment rating of 10% to Pardo's left shoulder based on the labral pathology and the partial thickness rotator cuff tear. This injury was settled for an agreed-upon 15% permanent partial impairment rating even though the UPS doctor assigned Pardo's shoulder a 10% impairment rating.

Following the March 2015 accident, Pardo was referred to KU MedWest and was examined by Dr. Rasmussen on April 8, 2015. Dr. Rasmussen noted complaints of pain in the subacromial region of Pardo's shoulder and ordered an MRI. This MRI was inconclusive. Dr. Rasmussen explained an MRI is often inconclusive when a patient had prior surgery because "there can be different pathology abnormalities that are related to previous surgeries." As treatment, Dr. Rasmussen provided a steroid injection in Pardo's shoulder; however, this injection provided minimal relief. Dr. Rasmussen performed a repeat arthroscopic procedure on June 4, 2015.

During this procedure, Dr. Rasmussen found labral pathology in Pardo's left shoulder and estimated over half of this pathology was related to Pardo's 2013 surgery. Dr. Rasmussen also found a new partial thickness rotator cuff tear. He testified that, within a reasonable degree of medical certainty, this tear was a new finding and related to

6

Pardo's March 2015 accident. He explained this new tear was in a different location than the one repaired in 2013 and "was not in direct connection with the original tear." Dr. Rasmussen surgically repaired the new tear in addition to performing an acromioplasty to help resolve impingement of the rotator cuff. In addition to the rotator cuff injury, Pardo also suffered a labrum tear, which was also surgically repaired, and bicep tendinitis.

Pardo continued to follow up with Dr. Rasmussen after surgery. Although Pardo continued to complain of pain and limited range of motion, Dr. Rasmussen released him to full work duty on August 26, 2015. Pardo's range of motion continued to diminish, and he returned to Dr. Rasmussen in October 2015. Dr. Rasmussen observed that Pardo's range of motion findings at this exam were inconsistent with his previous range of motion measurements and noted this discrepancy could have been because Pardo was performing relatively strenuous work duties.

Pardo again returned to Dr. Rasmussen in November 2015. Pardo's range of motion was greatly improved but was not normal. Pardo complained of hand pain, some headaches, and continuing left shoulder pain, particularly with overhead activity. Dr. Rasmussen believed the cause of Pardo's continuing pain was the March 2015 work accident. Dr. Rasmussen released Pardo at maximum medical improvement (MMI) on November 23, 2015, noting that Pardo felt he was ready to be released.

On December 17, 2015, at Pardo's counsel's request, Dr. P. Brent Koprivica examined Pardo. The parties stipulated to the admission of Dr. Koprivica's report and records into evidence. According to Dr. Koprivica, Pardo complained of significant ongoing symptoms with his left shoulder, including loss of strength, cramping, straining, and significant ongoing limited motion. Dr. Koprivica reviewed Pardo's medical records and history and performed a physical examination. He noted Pardo was cooperative and demonstrated appropriate pain behaviors and wrote: "There is pain and weakness in the left shoulder during the clinical examination. I would note that there is significant

7

variation in the demonstrated motion today compared to the motion measurements documented by Dr. Rasmussen."

Dr. Koprivica found Pardo's March 2015 work injury to be the prevailing factor in Pardo's new left shoulder structural injury, specifically the new partial thickness rotator cuff tear for which arthroscopy was performed. Dr. Koprivica found Pardo to be at MMI but indicated he would need future medical treatment. Dr. Koprivica wrote:

"Of note, Mr. Pardo clearly has new objective structural physical impairment based on evidence at the time of surgery of new partial-thickness rotator cuff injury that has been treated. There is new impact on activities of daily living based on this, in terms of limiting his tolerance to activities requiring use of his left shoulder.

"Despite this fact of clear-cut loss of ability to do activities of daily living, it is outlined on Page 23 in the American Medical Association, Guides to the Evaluation of Permanent Impairment, Sixth Edition, 'Rating permanent impairment by analogy is permissible only if The Guides provide no other method for rating objectively identifiable impairment.'

"In the case, the American Medical Association, Guides to the Evaluation of Permanent Impairment, Sixth Edition, does specifically address Mr. Pardo's clinical situation. As Dr. Rasmussen has outlined throughout the contemporaneous records, the presentation of impairment based on the March 18, 2015, injury suggested rotator cuff etiology. At the time of surgery, a partial-thickness rotator cuff tear was identified.

"As specifically noted in Table 15-5 on Page 402, in the American Medical Association, Guides to the Evaluation of Permanent Impairment, Sixth Edition, regarding the shoulder regional grid for upper extremity impairments, for a rotator cuff injury, with a partial-thickness tear with history of painful injury, with residual symptoms without consistent objective findings, a zero to two (0 to 2) percent upper extremity impairment is assigned as the range of impairment. However, it is specifically noted 'This impairment can only be given once in an individual's lifetime.' In Mr. Pardo's case, he has already had a fifteen (15) percent upper extremity impairment assigned for the partial-thickness

8

rotator cuff tear associated with his prior claim on July 11, 2013. According to the American Medical Association, Guides to the Evaluation of Permanent Impairment, Sixth Addition, a zero (0) percent impairment is assigned based on strict interpretation of the text.

"If one looked at an assignment of impairment using the American Medical Association, Guides to the Evaluation of Permanent Impairment, Fourth Edition, the typical impairment rating, excluding the prior fifteen (15) percent impairment, would be an additional ten (10) percent upper extremity impairment based on this injury.

"Obviously, this is going to be upsetting for Mr. Pardo in light of the fact that he has suffered a significant new injury that has necessitated surgery with objective structural pathology being identified. He is continuing to be impacted based on reduced ability to perform activities of daily living, but unfortunately, the new statutes requiring the use of the American Medical Association, Guides to the Evaluation of Permanent Impairment, Sixth Edition, allow him no recovery for permanent impairment."

On February 22, 2016, Dr. Rasmussen also provided an impairment rating. Using the Sixth Edition, he determined Pardo sustained a 5% impairment to the left upper extremity. Dr. Rasmussen testified the rating related to the March 2015 accident was over and beyond the 10% he assessed for the 2013 accident. Dr. Rasmussen explained the 5% assessment was based on Pardo's partial thickness rotator cuff tear requiring surgery and continuing pain.

Dr. Rasmussen admitted, however, that a strict interpretation of the Sixth Edition resulted in a 0% impairment for Pardo because he had received a previous impairment rating. Even if Pardo had no previous impairment, the Sixth Edition would provide a 0% to 2% impairment for Pardo's partial thickness rotator cuff tear and resulting surgery, which Dr. Rasmussen opined was too low. Dr. Rasmussen testified he did not believe 0% to be a fair representation of Pardo's impairment. Further, he stated the Sixth Edition allows only for the most significant pathology to be rated, with a "very small amount" of

9

modification allowed related to any secondary pathology. Dr. Rasmussen agreed the Sixth Edition, unlike the Fourth Edition, does not allow for a physician's skill, experience, expertise, training, or judgment in arriving at a rating.

Pardo continues to work for UPS and continues to struggle with pain and weakness in his left arm. He cannot extend his left arm overhead and requires help from his coworkers to perform some of his job duties.

On August 17, 2016, an ALJ issued an award denying compensation to Pardo: "The evidence is clear, and [uncontroverted], that [Pardo] suffered a new and distinct injury to the same member, however, to a different location of that member. Under the AMA Guides, 6th Edition, [Pardo] is prevented from receiving compensation where he has previously received compensation on that member." The ALJ also held:

> "The evidence presented herein, both doctors Rasmussen and Koprivica agree that under the AMA Guides, 6th Edition, [Pardo] is entitled to no permanent partial impairment based upon his occupational accident of March 18, 2015, regardless of any increase he may have suffered under the provisions of the doctor's experience, training, and certifications. Under the law set forth by the Kansas Legislature, the competent medical evidence presented herein, by both doctors Rasmussen and Koprivica, indicate that under the AMA Guides, 6th Edition, [Pardo] receives no additional impairment, since he has once previously received an impairment to the left shoulder."

Pardo then sought review of this award by the Board, arguing the statute that requires the application of the Sixth Edition, as applied to him, is unconstitutional. The Board affirmed the award denying compensation, stating that it did not have jurisdiction to rule on Pardo's constitutional challenges.

Board Member Thomas Arnhold joined the Board's Order and also authored a concurring order. Arnhold wrote: "In this Board Member's humble opinion, application

10

of the AMA *Guides* to [Pardo's] case as directed in K.S.A. 2014 Supp. 44-510d(b)(23) denies [Pardo] due process." Arnhold went on to write that not only was the requirement of the Kansas Legislature to calculate an award of workers compensation in accordance with the Sixth Edition not reasonably necessary to promote the general welfare of the state, but also the use of the Sixth Edition made the quid pro quo inadequate. Arnhold concluded that if he "had the authority and jurisdiction to do so, he would declare the portion of K.S.A. 2014 [Supp.] 44-510d(b)(23) requiring use of the AMA Guides [Sixth Edition], as applied to [Pardo], unconstitutional."

Pardo timely petitioned this court for judicial review of the Board's order affirming his award. The Kansas Supreme Court denied Pardo's motion to transfer his appeal to the Supreme Court on February 15, 2017.

ANALYSIS

Pardo brings before us a challenge to the constitutionality of the Kansas Workers Compensation scheme as applied to his situation. In support of his as-applied challenge, Pardo asserts five arguments on appeal: (1) Pardo's award of 0% impairment for his new and unrelated permanent partial impairment, combined with the exclusive remedy rule of the Workers Compensation scheme, denied him due process of law; (2) the mandatory use of the Sixth Edition to determine permanent partial impairment violates the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and § 1 of the Kansas Constitution Bill of Rights; (3) K.S.A. 2014 Supp. 44-510d(b)(23) is unconstitutional because the adoption of the Sixth Edition constitutes an impermissible legislative predetermination of adjudicatory scientific fact in violation of the separation of powers expressed in Article 2, § 1 and Article 3, § 1 of the Kansas Constitution; (4) K.S.A. 2014 Supp. 44-510d(b)(23) is unconstitutional because it denies Pardo due process through the determination of ratings and compensation amounts without consideration of his specific circumstances; and (5) the mandatory use of the Sixth

11

Edition mandated by K.S.A. 2014 Supp. 44-510d(b)(23) is unconstitutional as an unlawful delegation of the State's legislative powers to the AMA. We have combined and rearranged Pardo's arguments in our analysis as logic dictates.

Because all of Pardo's arguments on appeal challenge the constitutionality of a statute—the standard of review for each issue being identical and recitation of the standard repeatedly for each issue being unnecessary—we recite the standard of review up front only once.

> "Determining whether a statute violates the constitution is a question of law subject to unlimited review. Under our state's separation of powers doctrine, courts presume a statute is constitutional and resolve all doubts in favor of the statute's validity. A statute must clearly violate the constitution before it may be struck down." *Miller v. Johnson*, 295 Kan. 636, Syl. ¶ 1, 289 P.3d 1098 (2012).

We note that Pardo raised each of his arguments before the Board, but it lacks the authority to rule on the constitutionality of any statute, including K.S.A. 44-501 et seq., the Workers Compensation Act (the Act). All of Pardo's arguments on appeal stem from the Kansas Legislature's amendment of the Act. In 2013, the Legislature amended K.S.A. 44-510d(b)(23). Prior to this amendment, the statute read:

> "Loss of a scheduled member shall be based upon permanent impairment of function to the scheduled member as determined using the fourth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment, if the impairment is contained therein."

After this amendment, K.S.A. 2014 Supp. 44-510d(b)(23) read:

> "Loss of or loss of use of a scheduled member shall be based upon permanent impairment of function to the scheduled member as determined using the fourth edition of the American medical association guides to the evaluation of permanent impairment, if

12

the impairment is contained therein, until January 1, 2015, but for injuries occurring on and after January 1, 2015, shall be determined by using the sixth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein."

Interpretation of a statute is a question of law over which we exercise unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). Clearly, the amendment of the statute changed the AMA Guides to be used from the Fourth Edition to the Sixth Edition for injuries after January 1, 2015. Therefore, Pardo's award for his March 2015 injury was determined under the Sixth Edition which, according to both Drs. Rasmussen and Koprivica, was zero because he had received a previous award for the 2013 impairment to his left shoulder. Both doctors testified that this was not an adequate award based on Pardo's injury and that under the Fourth Edition, Pardo would receive an award for his work-related injury, although they disagreed on the precise impairment rating.

## DOES K.S.A. 2014 SUPP. 44-510d(b)(23) VIOLATE PARDO'S SUBSTANTIVE DUE PROCESS RIGHTS?

First, Pardo argues that, as applied to him, the Act is unconstitutional because it denies him substantive due process of law. Specifically, he argues that K.S.A. 2014 Supp. 44-510d(b)(23)'s requirement that the Sixth Edition be used to calculate his award and K.S.A. 2014 Supp. 44-501b(d)'s exclusive remedy mandate violate § 18 of the Kansas Constitution Bill of Rights and the Fourteenth Amendment to the United States Constitution.

A.    *Quid Pro Quo: The History of the Workers Compensation Scheme in Kansas and its Constitutional Foundations.*

Section 18 of the Kansas Constitution Bill of Rights guarantees an individual's right to a remedy:  "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law." It has long been held that "'[r]emedy by due course of law,' as used in section 18 of the bill of rights, means the reparation for injury, ordered by a tribunal having jurisdiction, in due course of procedure and after a fair hearing." *Hanson v. Krehbiel*, 68 Kan. 670, Syl. ¶ 2, 75 P. 1041 (1904); see *Miller*, 295 Kan. at 655 (quoting *Hanson*); *Ernest v. Faler*, 237 Kan. 125, 131, 697 P.2d 870 (1985) (same). Additionally, § 5 of the Kansas Constitution Bill of Rights states: "The right of trial by jury shall be inviolate." Both of these rights are fundamental constitutional rights. See *Ernest*, 237 Kan. at 131; *Bourne v. Atchison, T. & S. F. Rly. Co.*, 209 Kan. 511, 515, 497 P.2d 110 (1972); *State v. Larraco*, 32 Kan. App. 2d 996, 999, 93 P.3d 725 (2004).

The Fourteenth Amendment to the United States Constitution states, in pertinent part, that no State shall "deprive any person of life, liberty, or property without due process of law."  "'"Due process" emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated.'" *Ernest*, 237 Kan. at 129 (quoting *Ross v. Moffitt*, 417 U.S. 600, 609, 94 S. Ct. 2437, 41 L. Ed. 2d 341 [1974]).

In 1911, Kansas became one of the first two states in the nation to remove an employee's common-law right to bring a civil action against his or her employer for injuries caused by an employer's negligence. "Of the compensation laws now on the statute books, those of Kansas and Washington were the first to be enacted, both being approved on March 14, 1911." Gagliardo, "The First Kansas Workmen's Compensation Law," 9 Kan. Hist. Q. 383, 384 (1940). Several other states quickly followed suit—five

14

state acts became effective before Kansas' scheme took effect, and two others became effective on the same day. As the United States Supreme Court explained:

> "'The invention of workers compensation as it has existed in this country since about 1910 involves a classic social trade-off or, to use a Latin term, a *quid pro quo*. . . . What is given to the injured employee is the right to receive certain limited benefits regardless of fault, that is, even in cases in which the employee is partially or entirely at fault, or when there is no fault on anyone's part. What is taken away is the employee's right to recover full tort damages, including damages for pain and suffering, in cases in which there is fault on the employer's part.' P. Lencsis, Workers Compensation: A Reference and Guide 9 (1998)." *Howard Delivery Service, Inc. v. Zurich American Ins. Co.*, 547 U.S. 651, 662-63, 126 S. Ct. 2105, 165 L. Ed. 2d 110 (2006).

The Kansas Supreme Court has similarly summarized our Act:

> "In 1911, the legislature stripped employees of their common-law right to bring a civil action against employers for injuries caused by employers' negligence. . . . The Act allowed employees to quickly receive a set but possibly smaller sum of money for injuries received at work, regardless of whether the injuries were the result of the employer's negligence." *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 882-83, 942 P.2d 591 (1997).

"The Fourteenth Amendment to the United States Constitution and § 18 of the Bill of Rights of the Kansas Constitution do not forbid the creation of new rights, or the abolition of rights recognized by the common law." *Manzanares v. Bell*, 214 Kan. 589, 598, 522 P.2d 1291 (1974); see *Munn v. Illinois*, 94 U.S. (4 Otto) 113, 134-35, 24 L. Ed. 77 (1876). "No one has a vested right in common-law rules governing negligence actions which would preclude substituting a viable statutory remedy for one available at common law. The legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed or abolished." *Bair v. Peck*, 248 Kan. 824, Syl.

¶ 11, 811 P.2d 1176 (1991). However, there is a limit to how much the Legislature may reduce an individual's right to obtain a remedy. As warned in *Bair*:

> "We recognize that there is a limit which the legislature may not exceed in altering the statutory remedy previously provided when a common-law remedy was statutorily abolished. The legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and sufficient substitute remedy." 248 Kan. at 844.

See also *New York Central R.R. Co. v. White*, 243 U.S. 188, 205, 37 S. Ct. 247, 61 L. Ed. 667 (1917) (stating "[t]his, of course, is not to say that any scale of compensation, however insignificant on the one hand or onerous on the other, would be supportable," while upholding New York's workers compensation scheme, one of the first in the nation).

The issue before us is not whether the Act impinges on Pardo's constitutional rights—there is no question that it does. Rather, the issue is whether the Legislature's 2013 amendment to the Act takes this impingement on Pardo's due process rights from the realm of a constitutionally permissible impingement to one that is an unconstitutional infringement on Pardo's due process rights. Fortunately, the Kansas Supreme Court has supplied a test to make such a determination.

B.    *Application of the* Injured Workers of Kansas *Test*

According to our Supreme Court in *Injured Workers of Kansas*, when determining if a due process violation exists, the following two-step test should be utilized:

> "'If a remedy protected by due process is abrogated or restricted by the legislature, "such change is constitutional if '[1] the change is reasonably necessary in the public interest to promote the general welfare of the people of the state,' . . . and [2] the

16

legislature provides an adequate substitute remedy" to replace the remedy which has been restricted.' [Citations omitted.]" 262 Kan. at 854 (quoting *Lemuz v. Fieser*, 261 Kan. 936, 946-47, 933 P.2d 134 [1997]).

1.      *Step One:  Is this change in the remedy reasonably necessary in the public interest to promote the general welfare of the people of Kansas?*

"Under Step 1 of this due process test, the first question to ask is whether the new notice of claim statute imposed on plaintiffs injured at work, which restricts the plaintiffs' right to a workers compensation remedy, is reasonably necessary in the public interest to promote the general welfare of the people of the state. Another way to state this test is whether the legislative means selected . . . has a real and substantial relation to the objective sought. [Citations omitted.]" 262 Kan. at 854.

Therefore, we must determine if there was significant public interest to justify the amendment to K.S.A. 2014 Supp. 44-510d(b)(23) and "whether this [amendment] has a real and substantial relation to the objective sought." See *Bonin v. Vannaman*, 261 Kan. 199, 217, 929 P.2d 754 (1996).

Pardo argues that there is no evidence that Kansas legislators ever discussed reducing certain injuries to zero recovery for permanent partial impairment in the legislative history of 2013 Senate Bill 187, which created the statutory language at issue in this case. In *Injured Workers of Kansas*, the Kansas Supreme Court recognized:

"The goal to make the Act more medically and anatomically accurate is a legitimate state objective. . . . The plaintiffs contend that the statute's objective is an after-the-fact rationalization which was never espoused by the legislature as a purpose for the statute. This may be true; however, it does not matter.
       . . . .

17

"Thus, it is irrelevant whether the legislature actually verbalized the goal of making the Act more medically sound when it passed the [amendment]." 262 Kan. at 862-63.

In *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 253-54, 930 P.2d 1 (1996), *cert. denied* 520 U.S. 1229 (1997), our Supreme Court held that such an after-the-fact rationalization of the Legislature's action was permissible:

"'Under the reasonable basis test, it is unnecessary to ascertain the specific purpose the Kansas Legislature espoused, *if any*, in establishing the challenged [statute]. . . .'

". . . [B]ecause a legislature is not required to articulate reasons for enacting a statute, 'it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged [statute] actually motivated the legislature.' [Citations omitted.]"

While the *Peden* court was referring to the equal protection test, this rationale also applies to step one of the substantive due process test because the two tests weigh the same factors. See *Injured Workers of Kansas*, 262 Kan. at 862. Thus, the lack of legislative statement regarding the statute's change is permissible. However, the amendment must still have an objective and must have "a real and substantial relation" to this objective. See *Bonin*, 261 Kan. at 217.

To supply a rationalization for this current amendment, "[a]ll the State [has] to do [is] offer '"*any* state of facts [which] reasonably may be conceived to justify"'" the amendment from the Fourth Edition to the Sixth Edition. *Injured Workers of Kansas*, 262 Kan. at 863 (quoting *Peden*, 261 Kan. at 252-53). In *Injured Workers of Kansas*, the State provided this justification by pointing to facts included in an affidavit presented to the district court that concluded the amendments to the Act were medically accurate. The Supreme Court found that this fact reasonably justified the changes and the Legislature's goal to make the Act more medically sound. 262 Kan. at 863.

18

Here, UPS states in its brief that "[t]he manifest purpose for adoption of the [Sixth Edition] is to conform the Act to the most recent medical expertise as to what is medically and anatomically sound." However, it does not point to any fact or evidence in support of this assertion. Rather, it argues that the AMA stands behind the latest version of the Guides and that these Guides reflect the current state of medicine regarding recovery from a rotator cuff injury. But asking us to make this assumption without pointing to more to validate this assertion—as was done in *Injured Workers of Kansas*— puts us in the precarious position of trusting a national private organization—the AMA—to put the best interests of Kansans over the interests of the AMA's private members. This is an assumption we cannot make. UPS's assertion cannot carry the day; yet, the provided rationalization that the alteration of the remedy is reasonably necessary in the public interest to promote the general welfare of the people of Kansas is not the only suggested rationalization before us.

In its amicus brief, the State of Kansas argues it is well established that the Kansas Legislature had a rational basis for replacing an injured worker's common-law remedies with the 1911 Workers Compensation Act. However, this argument looks too far back. The inquiry is not whether the *initial* alteration of the remedy had a rational basis supporting it; rather, the inquiry is whether the *current* alteration of the remedy has a rational basis to support it. See 262 Kan. at 856-64 (analyzing whether amendment of K.S.A. 44-510d(a)(13) (Furse 1993)—referred to as "shoulder statute"—was reasonably necessary in public interest to promote general welfare, not whether implementation of Workers Compensation Act was so supported).

The State provides us with an additional justification for the 2013 amendment. It asserts that "[e]ven if the question were limited to whether the Legislature had a rational basis for replacing the Fourth with the Sixth Edition, the [amendment] would easily pass rational basis review given that the Sixth Edition is based on current medical knowledge." The State cites to *Injured Workers of Kansas* and provides a parenthetical

19

citation that "making the Act 'more medically rational' is a legitimate state interest." But like UPS, the State does not point to facts contained in the record of this case to support this assertion in its brief. Instead, the State claims that "[t]estimony before the Legislature indicated that the Sixth Edition is based on current medical knowledge and is superior to the Fourth Edition." For support, the State attached to its brief letters from two board-certified disability evaluating physicians to the Kansas Legislature supporting the amendment at issue here and agreeing that the Sixth Edition reflected an increased understanding of the science surrounding the information in the AMA Guides. See Dr. J. Mark Melhorn letter to the Kansas Legislature, p. 1 (March 2013); Dr. Peter V. Bieri letter to the Kansas Legislature, p. 1 (March 2013). The State also attached a copy of Dr. Melhorn's February 12, 2015 testimony before the House Committee on Commerce, Labor and Economic Development, opposing 2015 Senate Bill 167—a bill that would have returned the use of the Fourth Edition to workers compensation claims. See Attachment 12, Minutes for S.B. 167, Senate Committee on Commerce, February 18, 2015.

At first blush, like in *Injured Workers of Kansas*, this after-the-fact justification that the Sixth Edition is more medically sound likely validates the basis for the amendment to the remedy. But if we accept that the purpose of the amendment is to make the Act more medically accurate, the Sixth Edition, in Pardo's case, appears to contradict this goal. Surprisingly, the Sixth Edition recognizes that the impairment ratings are not based on objective data. The whole person impairment percentages are based on "normative judgment that are not data driven" that still "await future validation." AMA Guides Sixth Edition, pp. 6, 26. Although the language in the Sixth Edition itself seems to significantly undermine the assertion that utilizing the Sixth Edition makes the Act more medically sound, "the legislature heard all the evidence and relied on the evidence it found to be the most persuasive." *Injured Workers of Kansas*, 262 Kan. at 863. "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications,*

20

*Inc.*, 508 U.S. 307, 315, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993); *Downtown Bar and Grill v. State*, 294 Kan. 188, 198, 273 P.3d 709 (2012). Again, all the State is required to do is offer "'*any* state of facts [which] reasonably may be conceived to justify'" the amendment from the Fourth Edition to the Sixth Edition. (Emphasis added.) *Peden*, 261 Kan. at 253 (quoting *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S. Ct. 1101, 6 L. Ed. 2d 393 [1961]). The State satisfied this low burden by showing that the amendment to the Act was justified by offering parts of the legislative history supporting that the Sixth Edition was more medically sound than the Fourth Edition. Therefore, we now move to the second part of the *Injured Workers of Kansas* test.

2.      *Step Two:  Is there an adequate substitute remedy?*

"Even if the modification of a remedy is consistent with public policy, this does not necessarily satisfy due process concerns. In order to insure due process, the legislature is required to provide an adequate, substitute remedy when a common-law remedy is modified, restricted, or abolished." *Injured Workers of Kansas*, 262 Kan. at 864 (citing *Lemuz*, 261 Kan. at 948; *Bonin*, 261 Kan. at 218). If a subsequent legislative amendment to the Act reduces the remedy or makes it more difficult to obtain a remedy, a court must determine if the revised Act no longer provides an adequate substitute remedy, thereby "making the quid pro quo inadequate" and violating due process. *Injured Workers of Kansas*, 262 Kan. at 856.

Quid pro quo is at the heart of the constitutionality of the Act. "The Act allowed employees to quickly receive a set but possibly smaller sum of money for injuries received at work, regardless of whether the injuries were the result of the employer's negligence." 262 Kan. at 883. A century ago the United States Supreme Court employed the same reasoning: "[I]t perhaps may be doubted whether the State could abolish all rights of action on the one hand, or all defenses on the other, without setting up something adequate in their stead." *New York Central R.R. Co.*, 243 U.S. at 201. Further,

21

it would do "violence to the constitutional guaranty of 'due process of law'" if the Legislature set aside common-law tort liability (as it has done here) "without providing a reasonably just substitute." 243 U.S. at 201.

In *Injured Workers of Kansas*, 262 Kan. at 884-86, our Supreme Court warned of the current situation; although the quote is lengthy, it is instructive:

"*Bair v. Peck*, 248 Kan. 824, 844, 811 P.2d 1176 (1991), was the first case to express that an originally adequate quid pro quo for the abrogation of a common-law right might become so cut down and diluted that it would no longer be adequate to support the abrogation of the common-law right and would thus violate due process. In analyzing this issue, *Bair* identified a test to use in order to determine whether the legislature has altered the original statutory replacement to such an extent to make it unconstitutional. In *Bair*, this court stated:

"'[W]e are directly faced with a determination of whether the comprehensive remedy of mandatory insurance and excess coverage from the [Health Care Stabilization] Fund, provided by the original [Health Care Insurance Availability] Act, is a sufficient quid pro quo for this subsequent amendment or modification of the Act.

"'We have long recognized, at least tacitly, that major statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparation in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo. Provisions of the original Workmen's Compensation Act adopted in 1911 and upheld as constitutional in *Shade v. Cement Co.*, 92 Kan. 146, 139 Pac. 1193, *aff'd on rehearing* 93 Kan. 257, 144 Pac. 249 (1914), have been repeatedly amended without the adoption of an additional quid pro quo each time an amendment operated to the detriment of the employee. The original quid pro quo providing recovery for injury regardless of fault or negligence has been deemed sufficient to support dozens of amendments to the original act, many of which involved the abrogation of an existing common-law right.

22

"'In *Rajala v. Doresky*, 233 Kan. 440, 661 P.2d 1251 (1983), the court, in a unanimous opinion, found that the Kansas Workmen's Compensation Act, in providing immunity to fellow employees when compensation is recoverable under the Act, did not violate Section 18. In doing so, the court expressly stated that it did not "view as significant" the fact that fellow employee immunity was not enacted until 1967. "The Workmen's Compensation Act removes certain common law remedies for injured employees but provides a statutory substitute therefor." 233 Kan. at 441. While not specifically stated, the court obviously held that the 1967 amendment, which provided fellow employee immunity, did not require a new quid pro quo because the comprehensive remedy afforded by the Workmen's Compensation Act, already in existence, was sufficient.

. . . .

"'In considering the adequacy of the quid pro quo of comprehensive legislation, which substitutes a statutory remedy for one that formerly existed at common law, and its sufficiency to support subsequent amendments or modifications which diminish the substitute remedy originally granted, no hard and fast rule can apply to all cases. It is obvious that the needs and goals of comprehensive legislation such as the Workers Compensation Act, the Kansas Automobile Injury Reparations Act and the Health Care Provider Insurance Availability Act will change with the passage of time and the needs of a fluctuating society. It would take the wisdom of Solomon to devise comprehensive remedial legislation, such as that now before us, which would never need fine tuning, change, or modification. The Act is a piece of ongoing legislation which will, of necessity, require continuous modification to accomplish its goals.

. . . .

"'At the time of the malpractice alleged by the plaintiff in this case, each individual health care provider who was alleged to be negligent was required to maintain $200,000 malpractice coverage and, in addition, the Fund provided $3,000,000 excess coverage for each tortfeasor. Without the Act, there would be no guarantee that a plaintiff injured because of the negligence of a health care provider could ever recover for his injuries, let alone have an assured fund available of $3,200,000. That is a sizeable quid

23

pro quo, established by the Act, and certainly is an adequate substitute remedy for the common-law rights given up by injured malpractice victims. No argument is made that if the elimination of the employer's vicarious liability had been a part of the original Act, the quid pro quo would somehow be insufficient. We conclude that in reviewing the sufficiency of the substitute remedy as it applies to amendment or modification of comprehensive remedial legislation, each determination must be made on a case-by-case basis. *Recognizing that all such legislation may need periodic modification, we think the proper test to apply is whether the substitute remedy would have been sufficient if the modification had been a part of the original Act.* If so, then no new or additional quid pro quo is necessary to support the modification against a Section 18 attack. Any other holding would require that every modification of a substitute remedy provided by comprehensive legislation that originally abrogated a common-law remedy would require a new and additional substitute remedy. As already noted, it would be virtually impossible to draft such legislation in a form that would anticipate all contingencies and which would not thereafter need change and modification.

"'*We recognize that there is a limit which the legislature may not exceed in altering the statutory remedy previously provided when a common-law remedy was statutorily abolished. The legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and sufficient substitute remedy.* K.S.A. 1990 Supp. 40-3403(h) does not amend the Act to such a degree that the substitute remedy is no longer sufficient and we hold that the statute is not unconstitutional under Section 18 of the Kansas [Constitution] Bill of Rights.' 248 Kan. at 841-44."

Thus, we must determine if the "substitute remedy would have been sufficient if the modification had been a part of the original Act" while keeping in mind that

"*there is a limit which the legislature may not exceed in altering the statutory remedy previously provided when a common-law remedy was statutorily abolished*. The legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and sufficient substitute remedy." (Emphasis added.) *Bair*, 248 Kan. at 844.

24

Black's Law Dictionary defines "quid pro quo" as: "An action or thing that is exchanged for another action or thing of more or less equal value; a substitute." Black's Law Dictionary 1443 (10th ed. 2014) (also supplying the Latin definition: "something for something"). Pardo's situation cannot be held to be a satisfaction of the quid pro quo exchange—something for something—supporting the Act. Here, Pardo gets *nothing* in exchange for the removal of his right under § 18 to seek a common-law award from his employer, which flies directly in the face of the quid pro quo foundation that makes the Act constitutional. Looking to the point at which the Act was enacted in 1911, if it was part of the original Act that Pardo would receive nothing for his distinct and new work-related injury, then the Act would have been determined to be an insufficient substitute remedy upon its inception. See *Bair*, 248 Kan. at 844. As it was then, it is today: Eliminating any means for Pardo to recover under the Act or at common law is a violation of his substantive due process rights. K.S.A. 2014 Supp. 44-510d(b)(23), as applied to Pardo, prohibits Pardo from recovering an award for his permanent partial disability from a new and distinct work-related injury; and there can be no adequate substitute remedy for Pardo's right to sue his employer for negligence, and potentially recover an award at common law, when there is *no* remedy provided to Pardo under the Act.

The Florida Supreme Court addressed a similar question in *Westphal v. City of St. Petersburg*, 194 So. 3d 311 (Fla. 2016). There, the Florida Legislature amended its workers compensation act to limit an individual's temporary total disability benefits to 104 weeks. The Florida Supreme Court held this amendment to be unconstitutional because certain workers would fall into a gap where they would receive no such benefits, explaining:

> "We conclude that the 104-week limitation on temporary total disability benefits, as applied to a worker like Westphal, who falls into the statutory gap at the conclusion of those benefits, does not provide a 'reasonable alternative' to tort litigation. Under the

25

current statute, workers such as Westphal are denied their constitutional right of access to the courts." 194 So. 3d at 325.

As in *Westphal*, Pardo has no remedy because of K.S.A. 2014 Supp. 44-510d(b)(23) and no access to the courts because of K.S.A. 2014 Supp. 44-501b(d).

In response to Pardo's arguments, his employer makes several arguments. First, UPS makes a two-fold argument that Pardo has already received compensation for this injury. It argues it has paid to Pardo in excess of $27,000 in temporary total disability benefits and medical compensation and that in a tort suit Pardo would not have received any such payments unless the fact-finder found Pardo's negligence less than 50% and the fact-finder determined he should receive such an award. Second, UPS argues that when it settled with Pardo on his first shoulder injury, an agreed-upon permanent partial impairment rating of 15% under the Fourth Edition was assigned to his shoulder even though UPS's doctor assigned a 10% impairment rating. UPS argues that this 15% impairment rating settlement has now fully compensated Pardo for his current shoulder injury because the additional 5% impairment rating he received in the settlement (when the assigned rating was only 10%) now covers the new and additional assigned functional impairment rating of 5%. Stated more succinctly, UPS argues that because Pardo accepted a settlement for 15% impairment for his first injury—which UPS's doctor rated at only 10% under the Fourth Edition—Pardo has already been compensated for the additional 5% impairment for his second injury.

First, Pardo's collection of temporary total disability and medical expenses for his current injury is not adequate substitute compensation. The Kansas Supreme Court has repeatedly stressed that providing compensation for permanent partial impairment is an, if not *the*, essential purpose of the Act:

26

"We have heretofore stated that recovery for loss of earning power is a basic purpose of the act. In accordance with this principle we conclude a workman is entitled to recover an award equal to the percentage of his physiological capabilities lost by reason of an injury occurring within the scope of his employment. Stated more distinctly, he should recover his functional disability." *Anderson v. Kinsley Sand & Gravel, Inc.*, 221 Kan. 191, 196, 558 P.2d 146 (1976), *superseded by statute on other grounds as stated in Hughes v. Inland Container Corp.*, 247 Kan. 407, 415, 799 P.2d 1011 (1990).

This principle has been well established in Kansas for more than a century. Clearly, when enacting the Act, "[w]hat the legislature had in mind was compensation for loss of earning power as a workman as a result of injury." *Gorrell v. Battelle*, 93 Kan. 370, 375, 144 P. 244 (1914). Because compensation for permanent partial impairment is a necessary and essential component of the Act's quid pro quo, elimination of compensation for permanent partial impairment simply cannot be permissible even when the worker receives some compensation to cover his or her medical bills and temporary total disability benefits.

UPS's second assertion—that Pardo already received an award for his new permanent partial impairment because of his prior settlement of his first shoulder injury—flies in the face of the Act. K.S.A. 2014 Supp. 44-501(e) states, in pertinent part:

"An award of compensation for permanent partial impairment, work disability, or permanent total disability shall be reduced by the amount of functional impairment determined to be preexisting. Any such reduction shall not apply to temporary total disability, nor shall it apply to compensation for medical treatment.

"(1) Where workers compensation benefits have previously been awarded through *settlement* or judicial or administrative determination in Kansas, *the percentage basis of the prior settlement or award shall conclusively establish the amount of functional impairment determined to be preexisting*." (Emphasis added.)

27

Pardo's previous settlement conclusively establishes his preexisting impairment to be 15%, and a "rating conclusively established by the previous settlement must be recognized for all purposes." *Willoughby v. Goodyear Tire & Rubber*, No. 115,898, 2017 WL 658267, at *2-3 (Kan. App. 2017) (unpublished opinion). Therefore, Pardo has not previously been compensated for his current injury because his preexisting impairment rating was statutorily set at 15%. See K.S.A. 2014 Supp. 44-501(e). Pardo's new and additional 5% impairment rating would be compensated in addition to his preexisting permanent partial impairment rating.

UPS also argues that Pardo intentionally set up this constitutional challenge by choosing not to have Dr. Koprivica proffer any opinions about Pardo's neck pain and headaches and those ailments' impairment ratings. First, the parties stipulated to the admission of the medical records and Dr. Koprivica's report which included a reference to Pardo experiencing neck pain and headaches. Nowhere in the record on appeal is there any indication that UPS sought to have Pardo reassessed by its doctor, Dr. Rasmussen, or to have functional impairment ratings assigned to those alleged injuries. Second, whether or not Pardo "set up" his as-applied constitutional challenge is, frankly, irrelevant to this inquiry.

Third, UPS argues that Pardo was returned to full work duty and remains employed by it, so Pardo suffered no wage loss other than during the period of time that he received temporary total disability benefits. Pardo claims that he did suffer a loss in wages of almost $20,000 while receiving temporary total disability benefits. Pardo's employer then counters that "this is not a case where an injured worker is denied compensation for economic losses such as wages, fringe benefits, or future inability to earn one's pre-accident income." However, "[p]ermanent partial disability of an injured workman based upon substantial medical testimony is compensable notwithstanding he may earn as much or more after his injury in the same or other employment." *Daugherty*

28

*v. National Gypsum Co.*, 182 Kan. 197, 203, 318 P.2d 1012 (1957). Therefore, we reject UPS's argument.

Fourth, UPS argues that Pardo's 0% compensation award under the Sixth Edition is permissible because there are three injuries under the Fourth Edition that receive 0% permanent partial impairment compensation —a pelvic fracture under specific conditions, DRE lumbosacral category 1 injuries, and DRE thoracolumbar spine impairments. We are unpersuaded by this argument for three reasons. First, the Fourth Edition was truly a guide; it gave physicians discretion in exercising their independent judgment and the impairment ratings were nonbinding. As the Fourth Edition states:

> "The physician's judgment and his or her experience, training, skill, and thoroughness in examining the patient and applying the findings to the *Guides* criteria will be factors in estimating the degree of the patient's impairment. These attributes compose part of the 'art' of medicine, which together with a foundation in science, constitute the essence of medical practice." AMA Guides, Fourth Edition, p. 13.

Therefore, under the Fourth Edition, depending on the recovery of the individual, the physician could give a 0% rating or the physician could assign a different impairment rating as the physician found appropriate. There appears to be no such discretion in the Sixth Edition.

Second, even if the impairment ratings were fixed and there were injuries under the Fourth Edition that always, no matter the circumstances, received a 0% impairment rating, this does not defeat Pardo's claim. The fact that no claimant has ever brought a case arguing his or her due process rights were violated by such an award under the Fourth Edition does not mean that substantive due process was not denied. Logic dictates that this argument must fail. It is akin to claiming that if a state agency violates the due process rights of many individuals without one of those individuals bringing a lawsuit,

29

then an individual in a subsequent and similar incident cannot bring the first due process claim.

Third, Pardo brings an as-applied constitutional challenge to the statute, not a facial challenge. As established above, the amendment of the Act denies Pardo an adequate substitute remedy for his particular injury. Pardo does not suffer from any of the ailments that his employer asserts would receive a 0% impairment award under the Fourth Edition. The fact that the Fourth Edition may have rendered awards that amounted to nothing is inconsequential to Pardo's situation.

Finally, UPS argues that a jury deciding a personal injury action has discretion to award no or nominal damages. That is *precisely* the point: Here, no one had the discretion to award Pardo any benefits for his new permanent partial impairment that both doctors—his own and his employer's—recognize exists. Pardo never had a true opportunity to attempt to receive any compensation for his permanent partial impairment. The quid pro quo exchange that supports the Act's constitutionality requires that a claimant have the opportunity to recover for permanent partial impairment if the facts of the case warrant such compensation, as is the case here. See *Injured Workers of Kansas*, 262 Kan. at 856; *Anderson*, 221 Kan. at 196. We reject UPS's arguments.

The Sixth Edition and the exclusive remedy provision of the Act remove any opportunity for Pardo to attempt to recover for his new and distinct work-related injury. This simply is not an adequate substitute remedy and is the emasculation of Pardo's remedy by amendment of which the Kansas Supreme Court warned in *Bair*, 248 Kan. at 844. Thus, we hold that, as applied to Pardo, the use of the Sixth Edition to determine impairment ratings under K.S.A. 2014 Supp. 44-510d(b)(23) violates Pardo's substantive due process rights and is, therefore, unconstitutional. Given our unconstitutionality finding, we need not address Pardo's other constitutional arguments.

WHAT IS THE APPROPRIATE REMEDY?

By finding that K.S.A. 2014 Supp. 44-510d(b)(23) is unconstitutional as applied to Pardo, we must now consider what remedy, if any, is appropriate. Unfortunately, no party suggests a clear remedy, although at oral argument Pardo's counsel argued that Pardo's tort remedies should be restored. We envision three possible remedies.

First, we could strike the exclusive remedy mandate contained in K.S.A. 2014 Supp. 44-501b(d), which would allow Pardo to bring a civil action against his employer. Such a disposition, however, is the most radical option and may cause the opening of the hypothetical floodgates in workers compensation litigation and lead to confusion in lower administrative and judicial proceedings. However, Pardo would have the opportunity to recover for his injury.

Second, we could simply rely on the above discussion and holdings, reverse the administrative award and order, and remand the case for proceedings consistent with this opinion. This proposed disposition of the case would allow the ALJ to apply the Fourth Edition to the calculation of Pardo's permanent partial impairment rating and issue an award in accordance with the new rating. However, this disposition does not give very clear direction and may lead to unforeseen issues in the administrative proceedings with exactly how this disposition is to be applied. This was the disposition used in *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 782, 830 P.2d 41 (1992), where the Kansas Supreme Court held a portion of the Act unconstitutional as applied to the worker in that case.

Third, although not formally suggested by any party, the Kansas Supreme Court "has considered severing a provision from a statute if to do so would make the statute constitutional and the remaining provisions could fulfill the purpose of the statute. Each time, our Supreme Court has emphasized that the determination of whether the provision

31

may be severed 'depends on the intent of the legislature.'" *State ex rel Morrison v. Sebelius*, 285 Kan. 875, 913, 179 P.3d 366 (2008) (quoting *State v. Limon*, 280 Kan. 275, 302, 122 P.3d 22 [2005]). "'The enactment of a severability clause in a statute or series of statutes evidences the intent of the legislature that if some portion or phrase in the statute is unconstitutional, the balance shall be deemed valid.'" *Limon*, 280 Kan. at 302 (quoting *State v. Next Door Cinema Corp.*, 225 Kan. 112, Syl. ¶ 8, 587 P.2d 326 [1978]).

K.S.A. 44-574(b) states:

"If any provision or clause of this act or application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable."

Clearly, the Legislature intended that if a portion of the Act were found unconstitutional, either facially or as-applied, the constitutional portions of the Act should stand. Therefore, we may sever the portions of K.S.A. 2014 Supp. 44-510d(b)(23) that are unconstitutional as applied to Pardo. For ease of reference, K.S.A. 2014 Supp. 44-510d(b)(23) reads:

"Loss of or loss of use of a scheduled member shall be based upon permanent impairment of function to the scheduled member as determined using the fourth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein, until January 1, 2015, but for injuries occurring on and after January 1, 2015, shall be determined by using the sixth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein."

As shown below, the lined-out portion of the statute is unconstitutional as applied to Pardo:

32

"Loss of or loss of use of a scheduled member shall be based upon permanent impairment of function to the scheduled member as determined using the fourth edition of the American medical association guides to the evaluation of permanent impairment, ~~if the impairment is contained therein, until January 1, 2015, but for injuries occurring on and after January 1, 2015, shall be determined by using the sixth edition of the American medical association guides to the evaluation of permanent impairment, if the impairment is contained therein~~."

Therefore, if we sever the unconstitutional portion, as applied to Pardo, of K.S.A. 2014 Supp. 44-510d(b)(23), a constitutional application of the statute to Pardo would read:

"Loss of or loss of use of a scheduled member shall be based upon permanent impairment of function to the scheduled member as determined using the fourth edition of the American medical association guides to the evaluation of permanent impairment."

We find that severing the unconstitutional portion of the statute is the most appropriate option for a remedy as it best preserves the Legislature's intent, renders the statute constitutional in part, provides the most guidance for the administrative proceedings, and supplies Pardo with an adequate remedy. We reverse the award of the Board and remand with instructions to issue an award to Pardo consistent with this severed statute.

Reversed and remanded with directions.

33