NOT DESIGNATED FOR PUBLICATION

Nos. 120,841
120,842

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

NICHOLAS FORD,
*Appellant.*

MEMORANDUM OPINION

Appeal from Johnson District Court; ROBERT G. SCOTT, magistrate judge. Opinion filed February 5, 2021. Affirmed.

*David S. Bell* and *Sheena Foye*, of Wyrsch Hobbs & Mirakian, P.C., of Kansas City, Missouri, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, P.J., HILL and BUSER, JJ.

PER CURIAM: Nicholas Ford appeals several convictions related to operating a truck towing a fifth wheel recreational vehicle (RV) without a commercial driver's license (CDL). Ford raises several arguments on appeal. First, he asserts the district court miscalculated the weight of his vehicles for the purposes of determining whether he was subject to the CDL requirements. Alternatively, he argues the CDL requirements did not apply to him because he was engaged in private noncommercial use of the RV and because an exemption for new RVs applied to him. Lastly, Ford claims that if the new

1

RV exemption does not apply to him, the exemption violates his equal protection rights as a used RV seller.

Upon our review, we find no error and affirm the district court's judgment that Ford operated a vehicle without the required CDL.

INTRODUCTION

Ford owns Central RV where he buys, sells, repairs, and rents fifth wheel RVs and travel trailers. A fifth wheel RV is a trailer that rests on a unit attached to a towing vehicle, like a truck. Ford appeals from convictions in two separate cases related to driving a truck towing a fifth wheel RV without a CDL. Each case presents the two-fold question of whether the vehicles Ford operated met the statutory definition of a "commercial motor vehicle." If they did, then the inquiry becomes whether Ford was required to have a CDL while operating the vehicles or whether he was exempt from the CDL requirements.

Kansas has adopted the Uniform Commercial Driver's License Act (Act), K.S.A. 8-2,125 et seq., and it governs the operation of commercial motor vehicles. The Act defines "commercial motor vehicle" in relevant part as a vehicle used to transport passengers or property with a gross vehicle weight rating of 26,001 or more pounds. K.S.A. 2020 Supp. 8-2,128(f). The gross vehicle weight rating of a combination vehicle—like the trucks and fifth wheel RVs Ford operated—is the gross vehicle weight rating of the power unit plus the gross vehicle weight rating of the towed unit. K.S.A. 2020 Supp. 8-2,128(p). The Act is to "be liberally construed to promote public health, safety and welfare." K.S.A. 8-2,126(b).

Some vehicles are not included in the Act, including "motor vehicles, which would otherwise be considered commercial motor vehicles, if such vehicles are used

2

solely and exclusively for private noncommercial use and any operator of such vehicles." K.S.A. 2020 Supp. 8-2,127(d). The Federal Motor Carrier Safety Administration (FMCSA), an agency of the United States Department of Transportation, also granted a limited exemption to the CDL requirements for transport of newly manufactured RVs from manufacturing site to dealer location. 49 U.S.C. § 113(a) (2018); Commercial Driver's License Standards: Recreation Vehicle Industry Association Application for Exemption, 80 Fed. Reg. 18493 (Apr. 6, 2015).

The driver of a commercial motor vehicle must have and possess a CDL. K.S.A. 2020 Supp. 8-2,132(a). Drivers of commercial motor vehicles are also subject to numerous federal and state laws and regulations. Relevant to this appeal are regulations on window tinting (49 C.F.R. § 393.60[d]), medical examiner certificates (49 C.F.R. § 391.41), breakaway and emergency braking (49 C.F.R. § 393.43), and fire extinguishers (49 C.F.R. § 393.95[a]). See K.A.R. 82-4-3g (adopting 49 C.F.R. § 391 in relevant part); K.A.R. 82-4-3i (adopting 49 C.F.R. § 393 in relevant part).

Many of the issues Ford raises on appeal involve questions of interpretation of the previously mentioned statutes and regulations. These issues present questions of law over which appellate courts have unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019). We will separately address the issues Ford raises on appeal.

FACTUAL AND PROCEDURAL BACKGROUND

In the district court, Ford stipulated that he did not have a CDL at relevant times in this case. While in business at Central RV, Ford has obtained over 1,000 VIN inspections for his used RVs. The VIN inspection station previously was located adjacent to Central RV. When Ford requested a VIN inspection, an inspector would walk over to his lot and conduct it. In late 2016, the station stopped conducting inspections. Consequently, Ford began driving the RVs to Olathe, about 30 miles away, for VIN inspections.

Beginning in 2017, Ford testified that he had an ongoing disagreement with the Kansas Highway Patrol (KHP), the agency that conducts VIN inspections. Ford described an incident in February 2017 when he brought a title to Trooper David Albers at the Olathe inspection station. Ford testified that he provided Trooper Albers with a clean South Dakota title, but the trooper issued him a salvage title in return.

The next day, Ford said his business was "raided" by the KHP and the Kansas Department of Revenue (KDOR). Ford testified that officials came into his office and said, "[Y]ou'll do what I say or you get a $750 fine each time you don't." For his part, Trooper Albers testified that it was not a raid. He explained that the KHP accompanied the KDOR on an inspection at Ford's business to ensure that Central RV was complying with dealer licensing. At trial, Ford's counsel argued that these incidents showed the KHP was biased against Ford and targeted him for selective prosecution.

Ford brought a fifth wheel RV to the Olathe inspection station in February 2017. Trooper Albers saw Ford and believed that the vehicle combination Ford was operating that day made him subject to the commercial motor vehicle statutes. As a result, he concluded that Ford needed a CDL to operate the vehicle. Trooper Albers directed two troopers who specialize in CDL matters to inform Ford that he was subject to those rules and warn him that he may be stopped and ticketed. The troopers also offered Ford resources in order to comply with the CDL statutes.

A KHP trooper issued Ford an out-of-service order on March 6, 2017, for operating a commercial motor vehicle without a CDL. The out-of-service order meant that Ford could not operate that vehicle again until he obtained a CDL.

Trooper Joshua Weber observed Ford driving westbound on K-7 highway on March 30, 2017. Ford was returning to Central RV after obtaining a VIN inspection for a fifth wheel RV. Trooper Weber testified that the truck was a 5500 series Chevy ton-and-

4

a-half truck pulling a very large RV with a "not for hire" sign on the truck, and dealer plates on the trailer. Trooper Weber stopped Ford to conduct an inspection because he believed that Ford was operating a commercial motor vehicle.

Decals on the truck and trailer indicated gross vehicle weight ratings of 19,500 pounds for the truck and 14,000 pounds for the trailer. Accordingly, Trooper Weber believed that Ford needed a CDL to operate the vehicle. During his inspection, the trooper found several violations of FMCSA regulations including failure to possess a medical examiner's certificate or a fire extinguisher. Ford's window tint tested at 16 percent light transmission, which was lower than the 70 percent light transmission required. Additionally, the trailer's breakaway protection did not work. Finally, Trooper Weber noted that Ford was driving in violation of the March 6, 2017 out-of-service order. Although Ford told the trooper he did not believe that he needed a CDL, Trooper Weber cited Ford for the CDL violation and out-of-service order violation.

Trooper Weber did not weigh the truck or trailer before issuing the ticket to Ford. According to Ford, he weighed the vehicle and trailer after the traffic stop and they had a combined weight of 23,350 pounds.

At trial, Trooper Weber explained why he thought Ford was driving a commercial motor vehicle. In addition to the dealer plates and not for hire decal, the trooper also observed that the VIN inspection paperwork for the RV was titled in the name of Ford's business. As a result, Trooper Weber believed that Ford was furthering his business by transporting the RV and, thus, engaging in commerce.

Ford continued driving RVs to the Olathe inspection station despite not obtaining a CDL. Trooper Albers observed Ford arriving at one of these inspections with a very large truck and RV combination on May 23, 2017. The trooper described the truck as "just shy of being a semi." Trooper Albers looked up the gross weight vehicle rating of

5

the trailer and it was 18,000 pounds. He concluded that the gross vehicle weight rating of the truck and trailer were over the 26,001-pound threshold in the CDL regulations. Trooper Albers believed that Ford was operating a commercial vehicle because it was to be titled in the name of Central RV which is a public seller of used RVs. The trooper cited Ford for operating a commercial motor vehicle without a CDL. Although Trooper Albers did not personally weigh Ford's truck or the fifth wheel RV, Ford claimed the truck and trailer weighed 23,400 pounds or less.

The State charged Ford with six counts stemming from the March 30, 2017 incident: driving a commercial motor vehicle without a CDL; driving a commercial motor vehicle in violation of an out-of-service order; operating a commercial motor vehicle without having a medical examiner's certificate; operating a motor vehicle with improper breakaway or emergency brakes; operating a commercial motor vehicle with excessive window tint; and operating a commercial vehicle without a fire extinguisher. For the May 23, 2017 incident, the State only charged Ford with operating a commercial motor vehicle without a CDL.

Ford moved to dismiss the citations. He contended the actual weight of his truck and trailer on both days he received citations was less than 26,001 pounds and, thus, he was not required to have a CDL. He also argued that he was engaged in private noncommercial use of the trucks and RVs when he took the RVs to the KHP for VIN inspections. Ford later filed a second motion to dismiss. In that motion he challenged the constitutionality of the CDL regulations in two ways—asserting they were void for vagueness and denied equal protection of the laws to persons who towed used RVs. The district court did not rule on these motions before the trial.

After considering the trial evidence, the district court ruled that Ford was required to have a CDL because he was furthering his business by driving his fifth wheel trailers

to the VIN inspection station, and the new vehicle exemption did not apply. The court ordered Ford to pay a fine of $700.

Ford appeals.

## DID THE DISTRICT COURT ERR BY FAILING TO RULE ON FORD'S MOTIONS TO DISMISS?

Ford's first argument is that the district court erred by failing to rule on his motions to dismiss. Prior to trial, Ford's counsel asked the district court whether it was going to rule on the motions before evidence was presented or consider them with the case. The court replied that it would consider all the issues at the end of trial. In its ruling, the court did not explicitly address Ford's constitutional challenge.

Ford did not object to the district court's lack of findings on his motions to dismiss. "In the absence of a request by a party to the district court for additional findings," our court "generally assume[s] that the court made the findings necessary to support its ruling." *Douglas Landscape & Design v. Miles*, 51 Kan. App. 2d 779, 787, 355 P.3d 700 (2015). Our court may consider a remand if the lack of specific findings precludes meaningful appellate review. *Gilkey v. State*, 31 Kan. App. 2d 77, 78, 60 P.3d 351 (2003). As the State notes in its brief, however, the constitutional issues raised in Ford's motions present questions of law. Our court employs unlimited review over questions of law. *State v. Mossman*, 294 Kan. 901, 906, 281 P.3d 153 (2012). Accordingly, the lack of findings by the district court does not prevent us from reviewing the district court's denial of Ford's motions.

## DID THE DISTRICT COURT ERR BY CONSIDERING THE COMBINED WEIGHT OF FORD'S VEHICLES?

Ford contends that because K.S.A. 2020 Supp. 8-2,128(f) "clearly states 'vehicle' not combination vehicle," the district court should not have considered the combined

weight of the truck and RV in deciding whether Ford had operated a commercial motor vehicle. Since there was no evidence showing that his trucks or RVs, considered alone, had a gross vehicle weight rating exceeding 26,001 pounds, Ford argues that his convictions should be reversed.

This issue requires analysis of K.S.A. 2020 Supp. 8-2,128(f). The statute provides:

"(f) 'commercial motor vehicle' means a motor vehicle designed or used to transport passengers or property, if:
(1) The vehicle has a gross vehicle weight rating of 26,001 or more pounds or such lesser rating, as determined by rules and regulations adopted by the secretary, but shall not be more restrictive than the federal regulation." K.S.A. 2020 Supp. 8-2,128(f).

Ford focuses on the fact that the definition uses the word "vehicle," a singular noun. The problem with Ford's argument, however, is that it ignores the definition of "gross vehicle weight rating." As statutorily defined:

"(p) 'gross vehicle weight rating' means the value specified by the manufacturer as the maximum loaded weight of a single or a combination (articulated) vehicle. The gross vehicle weight rating of a combination (articulated) vehicle (commonly referred to as the 'gross combination weight rating') is the gross vehicle weight rating of the power unit plus the gross vehicle weight rating of the towed unit or units." K.S.A. 2020 Supp. 8-2,128(p).

In other words, the definition of "gross vehicle weight rating" includes combination vehicles, and this definition is incorporated into the definition of "commercial motor vehicle." This plain reading supports the district court's interpretation of the statute.

The evidence presented at trial established that on both dates when Ford received citations, he was operating a combination vehicle with a gross vehicle weight rating exceeding 26,001 pounds. As a result, Ford was operating a commercial motor vehicle, was required to have a CDL, and was required to follow commercial motor vehicle regulations unless an exemption applied.

IS THE PRIVATE NONCOMMERCIAL USE EXCEPTION TO THE CDL UNCONSTITUTIONAL?

Not all vehicles are subject to the Act. Among vehicles which are not covered by the Act are "motor vehicles, which would otherwise be considered commercial motor vehicles, if such vehicles are used solely and exclusively for private noncommercial use and any operator of such vehicles." K.S.A. 2020 Supp. 8-2,127(d). Ford contends the phrase "private noncommercial use" is unconstitutionally vague, thus rendering the statute void for vagueness. In this regard, Ford notes that the Act does not define "'private noncommercial use.'" He asserts that "[w]hat is and is not a commercial purpose is something that is widely debatable and has different meanings to different people."

A statute's constitutionality is a question of law subject to unlimited review. Appellate courts presume statutes are constitutional and must resolve all doubts in favor of a statute's validity. Courts must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would maintain the Legislature's apparent intent. *State v. Gonzalez*, 307 Kan. 575, 579, 412 P.3d 968 (2018).

"The test to determine whether a criminal statute is unconstitutionally void by reason of being vague and indefinite is whether its language conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice." *State v. Kirby*, 222 Kan. 1, Syl. ¶ 1, 563 P.2d 408 (1977). If a statute's terms are "so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application" it "is violative of due process." 222 Kan. 1, Syl.

9

¶ 1. "In determining whether a criminal statute is so vague that it violates due process, appellate courts conduct a two-prong inquiry, asking: (1) whether the statute gives fair warning to those potentially subject to it; and (2) whether it adequately guards against arbitrary and unreasonable enforcement." *Gonzalez*, 307 Kan. at 580.

We are persuaded that the phrase "private noncommercial use" is not vague and gives fair warning to those potentially subject to the statute. A person of ordinary intelligence can distinguish between a commercial and noncommercial use of a vehicle by discerning the reason the vehicle is being driven. If the vehicle is being operated for personal reasons, unrelated to any public or commercial venture, then the vehicle fits the definition. Black's Law Dictionary defines "noncommercial use" as "[a] use for private pleasure or business purposes that does not involve the generation of income or bestowing a reward or other compensation." Black's Law Dictionary 1854 (11th ed. 2019). The dictionary defines "commercial," in part, as "1. Of, relating to, or involving the buying and selling of goods; mercantile. 2. Resulting or accruing from commerce or exchange. 3. Employed in trade; engaged in commerce. . . . 5. Of, relating to, or involving the ability of a product or business to make a profit." Black's Law Dictionary 336 (11th ed. 2019). These commonly used definitions make plain the meaning of the phrase "private noncommercial use." For these reasons, the statute provides fair warning.

Additionally, there is no indication that the terminology of private noncommercial use is susceptible to arbitrary and unreasonable enforcement. The inquiry in determining whether the statute applies is simply to consider whether the driver has a commercial or noncommercial purpose. In this case, officers considered factors such as the dealer tags on Ford's vehicles, the fact that Ford titled the RVs in the name of his business, and the fact that Ford was obtaining VIN inspections in order to sell the RVs. That the troopers in this case considered these factors to be important in their enforcement determination supports the conclusion that K.S.A. 2020 Supp. 8-2,127(d) is not subject to arbitrary or

10

unreasonable enforcement. All things considered the private noncommercial use language is not unconstitutionally vague.

Ford makes a second argument on this point, highlighting K.S.A. 2020 Supp. 8-136. This statute governs dealer license plates for vehicle dealers and manufacturers. K.S.A. 2020 Supp. 8-136(a). Subsection (d) of the statute provides: "A trailer manufacturer or dealer is authorized to use a license plate issued under this section for the transportation of not more than four trailers. Such manufacturer or dealer shall be in compliance with the provisions of article 19 of chapter 8 of the Kansas Statutes Annotated, and amendments thereto." K.S.A. 2020 Supp. 8-136(d). K.S.A. 8-1901 et seq. covers traffic, size, weight, and load of vehicles but it does not contain any references to CDLs or commercial motor vehicles. Ford argues that K.S.A. 2020 Supp. 8-136 only subjects dealers to the rules in the explicitly mentioned statutes—K.S.A. 8-1901 et seq. Because K.S.A. 2020 Supp. 8-136 does not state that dealers must have a CDL, he reasons, a person of ordinary intelligence would believe that a dealer transporting less than four trailers is not required to obey the CDL regulations. We disagree.

Simply because a statute does not specifically state that a person is subject to CDL rules does not mean that a person is exempt from those rules. Such an interpretation is unreasonable. For example, K.S.A. 2020 Supp. 8-136 does not state that dealers are subject to laws prohibiting driving under the influence, but there is no doubt those laws still apply to dealers operating trailers. Ford's argument is unpersuasive.

DID THE DISTRICT COURT MISINTERPRET
THE PRIVATE NONCOMMERCIAL USE EXCEPTION?

Ford challenges the district court's interpretation of K.S.A. 2020 Supp. 8-2,127(d), the private noncommercial use exception to the CDL rules. The parties agree on the facts: When Ford received the citations, he was driving his RVs for the purpose of obtaining a VIN inspection so he could subsequently sell the RVs at his business. But the parties

11

disagree on the interpretation of K.S.A. 2020 Supp. 8-2,127(d) and whether Ford's activity falls under the private noncommercial use exception. Ford argues that he is in the business of buying, selling, and repairing RVs, and when he received his citations he was not engaged in any of those activities. The State counters that driving an RV to obtain a VIN inspection so the RV can be sold is engaging in the commercial use of that vehicle.

As explained above, if a person is operating a vehicle for commercial purposes that person does not fall under the private noncommercial use exception. Ford demonstrated a commercial purpose in operating his vehicles when he received his citations—obtaining VIN inspections in order to sell his RVs. There was no evidence indicating that Ford had a private or noncommercial reason for driving the vehicles. Moreover, if transporting RVs in the course of business was not covered by the CDL regulations, there would be no need for the new RV exemption discussed later in this opinion.

We find Ford's narrow reading of K.S.A. 2020 Supp. 8-2,127(d) is inconsistent with the Act's mandate to liberally construe its provisions. K.S.A. 8-2,126(b). The district court did not err by concluding that the private noncommercial use exception to the CDL rules did not apply to Ford.

DOES THE "NEW RV" EXEMPTION TO THE CDL RULES APPLY TO FORD?

On appeal, Ford also asserts that he is covered by the FMCSA's "new RV" exemption. The district court ruled this exemption did not apply to Ford.

Some background of the new RV exemption is in order. The FMCSA is authorized to grant exemptions from the federal CDL rules. 49 U.S.C. § 31136(e) (2018). A person may apply for an exemption if a federal motor carrier safety regulation prevents the person "from implementing more efficient or effective operations" and granting the

exemption "would maintain a level of safety equivalent to, or greater than, the level achieved without the exemption." 49 C.F.R. § 381.305(a). A person must file a written request that, among other things, addresses the safety impacts the exemption may have. 49 C.F.R. § 381.310(c)(4). The FMCSA then publishes a notice in the Federal Register asking for public comment on the application, and ultimately issues a decision. 49 C.F.R. § 381.315.

In 2015, the FMCSA granted a limited exemption to the CDL requirements for transport of newly manufactured RVs. 80 Fed. Reg. 18493. The FMCSA renewed the exemption in 2017. See 83 Fed. Reg. 7291 (Feb. 20, 2018). The Recreation Vehicle Industry Association (RVIA), a national trade association representing RV manufacturers and their component parts suppliers, filed the request. In its application, RVIA explained that the CDL requirement for vehicles weighing 26,001 pounds or more was preventing its members from implementing more efficient or effective operations due to a shortage of CDL drivers. 80 Fed. Reg. at 18493. The shortage created costly and inconvenient delays for the RV industry and for consumers. 80 Fed. Reg. at 18493-94. RVIA asked that a CDL not be required for vehicles with an actual weight of less than 26,001 pounds even if the gross vehicle weight rating exceeded 26,001 pounds. The exemption was to apply to newly manufactured RVs transported from the factory in which they were manufactured, or from a holding area, to a dealership site. 80 Fed. Reg. at 18493-94.

RVIA provided several reasons why it believed the exemption would result in a level of safety that was equivalent to or greater than the safety obtained by complying with the CDL requirements. These included:

- Drivers employed by RV manufacturers and dealers have more experience than a typical driver operating for recreational purposes;
- RV manufacturers and dealers have economic incentive to train and monitor their drivers because of exposure to liability for traffic accidents;

13

- RV accidents are infrequent;

- Newly manufactured RVs are less likely to present a safety concern due to mechanical failures; and

- Travel distances between the manufacturing sites and dealer locations are typically shorter than the usual distances traveled when RVs are in recreational use.

80 Fed. Reg. at 18494.

RVIA also pointed out that individuals who purchase RVs for recreational use are not required to have CDLs, and that obligating RV manufacturers and dealers to obtain a CDL would be anomalous. 80 Fed. Reg. at 18494.

FMCSA granted the request, finding RVIA's arguments persuasive. 80 Fed. Reg. at 18494-95. It limited the exemption to "employees of driveaway-towaway companies, RV manufacturers, and RV dealers transporting RVs between the manufacturing site and dealer location and for movements prior to first retail sale." 80 Fed. Reg. at 18495.

Ford argues that the exemption allows him to drive an RV without a CDL "prior to its first retail sale with Central RV." But the exemption is not so expansive. RVIA's request only covered newly manufactured RVs, not used RVs. One of the points in support of RVIA's argument was that newly manufactured RVs are less likely to present a safety concern due to mechanical failures. The rule states that it applies prior to the first retail sale of an RV. Additionally, it only applies to transport between a manufacturing site and dealer location. This clearly excludes used RVs being transported for VIN inspections. Accordingly, the district court did not err by ruling that the exemption did not apply to Ford.

14

IS THE "NEW RV" EXEMPTION TO THE CDL RULES UNCONSTITUTIONAL?

In an alternative argument, Ford contends the new RV exemption violates his equal protection rights. First, he asserts the exemption treats new RV sellers differently than used RV sellers, and that these groups are similarly situated. Second, he argues there is no rational basis for treating these groups differently, resulting in a violation of his equal protection rights. Our court employs unlimited review over constitutional questions. *Gonzalez*, 307 Kan. at 579.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." An appellate court uses a three-step process when reviewing an equal protection claim:

> "First, it considers whether the legislation creates a classification resulting in different treatment of similarly situated individuals. If the statute treats "'arguably indistinguishable'" individuals differently, the court determines next the appropriate level of scrutiny to assess the classification by examining its nature or the right at issue. Then, the court applies that level of scrutiny to the statute. [Citations omitted.]" *State v. LaPointe*, 309 Kan. 299, 316, 434 P.3d 850 (2019).

The Equal Protection Clause is only implicated if a law treats similarly situated individuals differently. *State v. Salas*, 289 Kan. 245, 248, 210 P.3d 635 (2009). The burden is on the complaining party to show that he or she is similarly situated to others who are being treated differently. "Because the complaining party has this burden and also because a court presumes a statute is constitutional, the parameters of a court's consideration of whether individuals are similarly situated is set by the distinctions argued by the complaining party." 289 Kan. at 249.

Ford and the State agree that used RV sellers and new RV sellers are similarly situated. But these broad classifications are misguided because they are not the distinctions made by the exemption. Rather, the class of persons covered by the exemption is "employees of driveaway-towaway companies, RV manufacturers, and RV dealers transporting RVs between the manufacturing site and dealer location and for movements prior to first retail sale." 80 Fed. Reg. at 18495. Ford's class, on the other hand, is persons who transport used RVs at any time for commercial purposes. As clarified, the class covered by the exemption is much narrower than the class to which Ford compares it, and the two classes are not engaging in the same activity. These distinguishing facts demonstrate that the classes are not similarly situated. Another reason the two classes are not similarly situated is that new RV dealers (represented by RVIA) filed a request for exemption with the FMCSA. In this request, RVIA provided evidence that the exemption "would maintain a level of safety equivalent to, or greater than, the level achieved without the exemption." 49 C.F.R. § 381.305(a). There is no evidence that Ford has filed such a request, which further differentiates his situation from the new RV sellers.

Moreover, assuming that the two classes at issue were used RV sellers and new RV sellers, and these classes are similarly situated, the classes would be treated identically under the facts of this case. New RV sellers are not exempt from CDL requirements when they drive RVs to VIN inspection stations. The new RV sellers are only exempt from the CDL regulations when transporting newly manufactured RVs from a manufacturing site to a dealer location before their first retail sale.

For all these reasons, the classes proposed by Ford are not similarly situated. Even if they were, new RV dealers would be treated no differently than Ford if they engaged in the same activities.

16

For the sake of argument, assuming that the classes are similarly situated, Ford must establish that the exemption does not pass the appropriate level of scrutiny. There are three levels of scrutiny: strict scrutiny, intermediate scrutiny, and the rational basis test. The level of scrutiny applied "depends on the nature of the legislative classification and the rights affected by that classification. The general rule is that a law will be subject to the rational basis test unless the legislative classification targets a suspect class or burdens a fundamental right. [Citations omitted.]" *State v. Limon*, 280 Kan. 275, 283-84, 122 P.3d 22 (2005). Here, the exemption does not target a suspect class or burden a fundamental right, so rational basis review is applicable.

In order to pass a rational basis review the exemption must implicate legitimate goals and the means chosen by the legislature must bear a rational relationship to those goals. 280 Kan. at 288. The State has no burden to produce evidence on the rationality of the exemption because "'a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.' [Citation omitted.]" *Heller v. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993). Instead, "'[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.' [Citation omitted.]" 509 U.S. at 320. Ford has not met this burden.

In our view, the FMCSA had a rational basis for granting the new RV exemption to the CDL requirements. Primarily, RVIA satisfied the requirements of the request process. RVIA submitted a written application detailing why it needed the exemption, analyzing whether granting the exemption would negatively impact safety, and providing evidence in support. RVIA also noted that newly manufactured RVs are less likely to present a safety concern due to mechanical failures. On the other hand, Ford has not taken any of these steps, so it is rational that the FMCSA did not include used RV sellers like him in the exemption. In short, the FMCSA had a rational basis for limiting the exemption to the parameters of the request because those are the parameters upon which

17

evidence was presented. Accordingly, we hold the exemption does not violate Ford's equal protection rights.

Affirmed.